JAMES L. AND SAMUEL L. TAYLOR, ADMINISTRATORS OF ROBERT TAYLOR, DECEASED, PLAINTIFFS IN ERROR, *v.* NATHAN T. CARRYL, WHO SURVIVED WILLIAM J. WARD.

Where a vessel had been seized under a process of foreign attachment issuing from a State court in Pennsylvania, and a motion was pending in that court for an order of sale, a libel filed in the District Court of the United States, for mariners

wages, and process issued under it, could not divest the authorities of the State of their authority over the vessel; and of the two sales made, one by the sheriff and one by the marshal, the sale by the sheriff must be considered as conveying the legal title to the property, and the sale by the marshal as inoperative.

Where property is levied upon, it is not liable to be taken by an officer acting under another jurisdiction.

The cases examined where conflicting claims against the same property are set up under the laws of the United States and under State laws.

The process of foreign attachment in Pennsylvania is identical with that which issues out of the District Court of the United States sitting in admiralty.

The admiralty jurisdiction of the courts of the United States, although exclusive on some subjects, is concurrent upon others. The courts of common law deal with ships or vessels as with other personal property.

In order to give jurisdiction *in rem,* the seizure by the marshal must have been valid; and this was not the case when the vessel was, at the time of seizure, in the actual and legal possession of the sheriff.

THIS case was brought up from the Supreme Court of Pennsylvania, by a writ of error issued under the twenty-fifth section of the judiciary act.

The facts of the case are particularly stated in the opinion of the court.

It was argued by *Mr. Cadwallader* and *Mr. Hood* for the plaintiffs in error, and by *Mr. Evarts* for the defendant.

The Reporter would be much pleased if he could place before his readers an extended report of the arguments of counsel in a case of such importance and general interest to the profession as the present. But he is admonished by the size to which the present volume has grown, that it has already reached the customary limits of such a work; and all that he can do is to present a brief sketch of the views of the respective counsel.

After examining the respective jurisdictions of the State and admiralty courts, and the nature of the process and proceedings, the counsel for the plaintiffs in error deduced the following propositions:

1. That over all maritime liens for seamen's wages, the District Court of the United States has exclusive cognizance whenever invoked by the seamen, and the State courts have no jurisdiction over such liens.

2. Although a State court has no jurisdiction whatever over a maritime lien, yet that court will afford to a seaman, if he choose to resort to it, a remedy by *personal* action, against the owner or master of the vessel, on the contract for wages, or perhaps by permitting him to intervene in a personal action, already pending; but the cognizance of the State court does not attach, unless specially invoked by the seaman.

3. That the existence of one or more remedies for a seaman to recover his wages in a State court, does not oust the cogni-

zance of the admiralty court over his lien against the vessel; the seaman may pursue either of these remedies only, or both together.

4. That the pendency of proceedings in foreign attachment in a State court against the vessel, at the suit of a general creditor of the owner, and the seizure and sale of the vessel by the sheriff under such proceedings, do not oust the admiralty jurisdiction of the District Court of the United States over liens for the wages of the seamen, if invoked by them, nor prevent the admiralty court from enforcing such liens against the vessel in specie, by proceedings *in rem.*

5. That the sale of a vessel, under a writ or order of a common-law court, does not, under the general maritime law of the United States, divest the lien of a seaman for his wages, so as to prevent its enforcement against the vessel in specie, by the District Court of the United States, under proceedings *in rem* in the admiralty.

6. That a sale of a vessel under a writ or order of the District Court of the United States, proceeding *in rem* against a vessel in the admiralty, not appealed from nor reversed, passes to the purchaser a title to the vessel discharged of all liens and encumbrances whatever.

7. That where a vessel subject to maritime liens for seamen's wages is seized by the sheriff under a writ from a State court, and subsequently a proceeding *in rem* is commenced in the admiralty to enforce these liens, it would be an usurpation of admiralty jurisdiction by the State court, if, after being informed of the existence of said liens and proceedings, the State court ordered a sale of the vessel, as perishable and chargeable, on the ground, *inter alia*, of the accruing daily expenses of the said mariners' wages.

The proceeding under which the sale was ordered by the State court was based not upon the simple allegation of perishableness, but upon an allegation of perishableness by reason of *chargeableness;* in other words, the sale was prayed and ordered because the subject was a chargeable one. That which was alleged to render her thus chargeable was mainly an accumulating liability for the very seamen's wages in question. Without this liability, *non constat*, that any sale would have been ordered. In correcter language, it is legally to be assumed, that without it there would have been no sufficient chargeableness. For these wages, the lien had already attached to the vessel by the proceeding in admiralty. Thus, in order to render the vessel saleable as chargeable, the subject of the lien, which could constitutionally be enforced directly in the admiralty alone, was by a usurpation of jurisdiction imported

into the proceeding in the State court, as the foundation of the very proceeding in question.

This appears from the order of sale of the State court made not under one alone, but under both of the foreign attachments, and from the petition referred to in the order of sale of Robert Bell, one of the plaintiffs in attachment, alleging the vessel in question to be "of a chargeable and perishable nature, from the daily expense of wharfage, custody fees, mariners' wages, and liable to deterioration in her hull, apparel, and furniture, from exposure to ice, wind, sun, and weather."

8. The legal custody of the vessel claimed for the admiralty in this case will not necessarily lead to conflict between the United States and State courts and their respective officers; but, on the contrary, will tend to prevent such conflicts, by maintaining each in the legitimate exercise of its jurisdiction and powers.

According to the English admiralty law, as recognised by Sir John Jarvis, Chief Justice of the Common Pleas, when a vessel subject to maritime liens for seamen's wages is seized by the sheriff, under a writ of foreign attachment from a State court, and subsequently a proceeding *in rem* is commenced in the admiralty, to enforce the seamen's liens, the latter proceeding relates back to the time when the liens were created, and in contemplation of law the legal custody of the vessel is deemed to have been in the admiralty from the period when the lien first attached, (Harmer *v.* Bell, 22 Eng. L. and Eq. R., 72,) so far at least as may be necessary to protect these liens. This legal custody of the admiralty is not incompatible with, and does not necessarily interfere with, the possession of the sheriff, nor the proceedings in the State court. In such a case, the sheriff may hold the vessel until bail be entered for the owner, or until the owner's interest has been sold to satisfy plaintiff's claim. But the proceedings *in rem* in the admiralty, being known to the purchaser at the sheriff's sale, he will take the vessel *cum onere*—and, on paying off the maritime liens, will acquire a perfect title. On the other hand, if the admiralty sell the vessel whilst the proceedings in the State court are pending, and the sheriff still in possession, the title of the purchaser is good against all the world; but the surplus that may remain out of the proceeds of the admiralty sale, after payment of the liens against the vessel, would, on application to that court, be ordered to be paid to the sheriff, or into the State court.

In the case of the Royal Saxon, the purchasers at the sheriff's sale might have obviated the necessity of a sale by the admiralty by satisfying the maritime liens. They could have dis-

charged the vessel from them by paying the holders, or, by leave of the admiralty court, they could have paid into its registry enough to satisfy them, being entitled to receive back any surplus. In this way they could have acquired a perfect title; but they pursued neither course, nor did they bring the matter in any form before the District Court of the United States. The maritime liens therefore continued attached to the vessel after the sheriff's sale, and until sold by the marshal, when Mr. Taylor became the purchaser.

If the doctrines laid down in this case by the Supreme Court of Pennsylvania, and on which the judgment of that court can alone be sustained, are to be adopted as the maritime and admiralty law of the United States, the privileged lien, heretofore supposed to belong to mariners, is in effect taken away. It will be in the power of a master or owner of a vessel, in every case, to prevent seamen from availing themselves of their lien.

This may be effected by procuring a constable to seize the vessel, and hold her in custody until she is about to sail, and then release her. It only requires a *fi. fa.* or attachment to issue on a judgment confessed before a justice of the peace for a small amount, to a real or pretended creditor; because, according to the doctrine of the Supreme Court of Pennsylvania, there is no peculiar potency in admiralty process *in rem*, against ships—"in substance, the proceeding by a justice of the peace against a stray cow is exactly equivalent." (Record, 72; Taylor *v.* Carryl, 12 Harris, 261.) By the seizure of the ship, therefore, whether by sheriff or constable, the whole custody of her is in the State tribunal, (Record, 61, 77,) and any action or decree afterwards by the admiralty, in order to enforce the mariners' lien against the ship, would be in relation to a subject over which it had no control, and would consequently be void." (Record, 61; Taylor *v.* Carryl, 12 Harris Rep., 269.)

Judge Wells, in his opinion delivered in the case of the Golden Gate, (Newberry's Adm. Rep., 296, 308; 5 Am. Law Reg., 155, 158,) points out other inconveniences from allowing to the process of justices of the peace, &c., the force of proceedings *in rem.* "If," says he, "there is an average of fifty counties to each State, and twenty justices of the peace to each county, we should then have in the United States thirty-one thousand courts of admiralty and maritime jurisdiction, to say nothing of the courts of record," &c. (5 Am. Law Reg., 158, 159.)

The Supreme Court of Pennsylvania have decided that, by the law of that State, a seaman may come into her courts and

enforce his maritime lien for wages against the proceeds of a vessel sold by the sheriff. Although this be a doctrine unknown to the old common law, yet there would be no reason to complain of it, if that court had not gone farther, and decided that the seaman's only remedy in such a case was in the State court, and that he had no longer a right to enforce his lien in the admiralty. The State court undertook to define the limits of the jurisdiction of the admiralty courts; and if it has erred in this, it is the right and duty of the Supreme Court of the United States to correct the error, and whilst asserting the legitimate jurisdiction of the admiralty, to administer the maritime law as it has been recognised and established by the Constitution and laws of the United States. It is an important function of this court to defend the lawful jurisdiction of the admiralty, and the just efficacy of its process against judicial as well as legislative encroachment, among other reasons, because on these mainly depend the rights of seamen and others having maritime liens.

In this case, the Supreme Court of the United States is not called on to alter in any respect the municipal law of Pennsylvania, but simply to declare that the additional remedy allowed to seamen by that law does not oust the admiralty of its exclusive jurisdiction, if the seamen prefer a recourse to it, rather than to the remedies provided by the State law.

A reversal, therefore, of the judgment of the Supreme Court of Pennsylvania will involve no victory of Federal over State authority and power. It will concede to the admiralty and maritime jurisdiction of the Federal courts nothing but what the stanchest friend of State rights and the most jealous adversary of Federal encroachment may safely concede, because imperatively required for the safety and protection of a class of men whose rights are specially protected by the commercial codes of every civilized nation, and by none more carefully than by that of the United States; rights, in the maintenance of which the Commonwealth of Pennsylvania and her people are as much interested as the people of any of the other States, for the sake of those of her citizens (and they are very numerous) who have devoted themselves to the sea.

The third point of the counsel for the defendant was the following :

*Third Point.* The judgment below on the merits of the controversy determined by it is free from error.

I. The plaintiff below, by his purchase at the sheriff's sale, acquired a good title to the barque "Royal Saxon."

1. By the process of foreign attachment, and the possession

of the sheriff under that process, the barque was in the custody of the law, to abide the result of the suit in which process issued. (Act Penn., June 13, 1856, secs. 48, 50; same, March 20, 1845, sec. 2; Morgan *v.* Whatmaugh, 5 What., 125; Serg. For. Att., 1, 23.)

2. Its sale, pending the suit, as perishable property, was regular, and by authority of a competent court having jurisdiction.

3. The judicial sale of property as perishable is, in the nature of the procedure, and from the same policy and necessity which occasion the sale, a conversion or transmutation of the thing itself, overriding every question of title and lien.

(1.) The right and power of such sale are not supported upon any notion or determination of title, but wholly upon the condition of the thing sold.

(2.) The motive and effect of the sale are for the benefit of the real title and of every valid lien, to save from perishing to the owner and the lienor the subject of his property or lien.

(3.) To say the court has this right to sell the thing in its custody, and exercises this right, and yet the buyer at such sale does not take the thing sold, but only the right, title, or interest, of some particular person or persons, is insensible, and subversive of the whole doctrine of sales by necessity. (Foster *v.* Cockburn, Sir Thomas Parker's Exch. R., 70; Jennings *v.* Carson, 4 Cranch, 26, 27; Grant *v.* McLaughlin, 4 Johns. R., 34; The Tilton, 5 Mas., 481, 482.)

(4.) The remedy of any party whose property has been, without right as against him, brought into this peril of litigation which has necessitated, and so justified, its valid sale, is by action against the suitor or the officer who has wrongfully subjected it to this conversion, or by claiming upon the proceeds of the sale, at his election.

II. The defendant below, by his purchase at the marshal's sale, acquired no title to the barque.

1. When the attachment and monition issued in the admiralty suit, the barque was in the custody of the sheriff of the county of Philadelphia, and so continued until after the order for its sale as perishable.

The marshal, therefore, never had custody, nor the District Court possession, of the barque, to support any jurisdiction to sell as perishable. (The Robert Fulton, 1 Paine C. C. R., 625, 626; Hagan *v.* Lucas, 10 Peters, 403; Jennings *v.* Carson, 4 Cranch, 26, 27.)

2. The effect of a sale in admiralty, pending a suit, of property as perishable, is not at all strengthened or qualified by the nature of the claim or lien prosecuted in the suit.

Whether the cause of action be of one degree of privilege or priority or another, the efficacy of the writ to the marshal is the same, the custody of the court is the same, and the grounds and effect of the special sale of the property in custody are the same.

So, too, whether the cause of action fail to be supported in the final decree is immaterial; the jurisdiction to sell, and the title conveyed, depending on the court's possession of the suit, and of the perishable property, and not at all on the event of the suit. (Harmer *v.* Bell, the case of the Bold Buccleugh in Privy Council, 22 Eng. L. and E.)

3. The title of the defendant below, then, derives no special validity from the peculiar privilege among admiralty liens accorded to wages.

The whole question is, between the two sales by the two courts, as to which passed the title; if the cause of action in the Supreme Court of Pennsylvania had been for seamen's wages, and the cause of action in the District Court had been on a charter party, or bill of lading, the question of the effect of the two sales would rest on the same considerations as under the actual facts in the case.

III. The sale by the sheriff gave to the purchaser a title discharged of all liens, which thereafter attached only to the fund produced by the sale. This effect follows every judicial sale of the *res* itself, (made by a court having jurisdiction,) and the claim of seamen's wages has no exemption from this consequence.

1. The nature of the lien of seamen's wages subjects it to this consequence.

It is neither a *jus in re* nor a *jus ad rem;* it gives no right of possession, and is not displaced by change of possession—it is a right of action to be enforced by judicial procedure, and with (among others) the special remedy of being satisfied, by means of such procedure, out of the ship. (The Nancy, 1 Paine C. C. R., 184; The Brig Nestor, 1 Sumn., 80; Ex parte Foster, 2 Story, 144; Harmer *v.* Bell, 22 Eng. L. and E. R., 72.)

Whatever prevents the judicial *process* (from whose vigor alone the seamen's right of action is converted into a right of possession or dominion over the ship) from reaching the ship, postpones or defeats, as the case may be, the enforcement of his right of action against the ship.

If the ship be locally without the jurisdiction of the process, this postpones or defeats the remedy.

If the ship, though locally within the jurisdiction of the process, be withdrawn from its operation by a previous subjection to the process of another jurisdiction, this postpones or defeats

the remedy. (The Robert Fulton, *ut supra*; Hagan *v.* Lucas, same.)

A conversion of the ship into proceeds by a lawful exercise of dominion over it, by paramount authority, or through judicial sentence, defeats the remedy against the ship, which, as it were, no longer exists, in specie, to meet the remedy.

The familiar rule, that seamen's claims attach for their satisfaction to the proceeds of such sales, proves that the ship is discharged from their claims; otherwise the seamen would take the purchase-money, produced by other interests than theirs, to discharge claims still resting on the ship, and not included in the purchase-money. (Presb. Corp. *v.* Wallace, 3 Rawle, 150; Sheppard *v.* Taylor, 5 Pet., 675; Brown *v.* Full, 2 Sumn., 441; Trump *v.* Ship Thomas, Bee's R., 86; The St. Jago de Cuba, 9 Wheat., 414, 419.)

Mr. Justice CAMPBELL delivered the opinion of the court.

This cause comes before this court by writ of error to the Supreme Court of Pennsylvania, under the twenty-fifth section of the judiciary act of the 24th September, 1789.

The defendants (Ward & Co.) instituted an action of replevin in the Supreme Court of Pennsylvania, for the barque Royal Saxon.

Upon the trial of the cause at *nisi prius*, it appeared that the barque arrived at the port of Philadelphia in October, 1847, on a trading voyage, and was the property of Robert McIntyre, of Londonderry, in Ireland. In November, 1847, she was seized by the sheriff of Philadelphia county, under a writ of foreign attachment that was issued against her owner and another, at the suit of McGee & Co., of New Orleans, from the Supreme Court; and at the same time her captain was summoned as a garnishee. On the 15th January, 1848, those creditors commenced proceedings in the Supreme Court to obtain an order of sale, because the barque was of a chargeable and perishable nature, suffering deterioration from exposure to the weather, and incurring expenses of wharfage, custody fees, &c., &c. This application was opposed by the captain of the barque, but was allowed by the court on the 29th of January, 1848. The vessel was duly sold by the sheriff under this order, the 9th February, 1848, to the plaintiffs in the replevin, Ward & Co.

On the 21st January, 1848, while the writs of attachment were operative, and a motion for the sale of the barque was pending in the Supreme Court, the seamen on board the barque filed their libel in the District Court of the United States for the eastern district of Pennsylvania, sitting in admiralty, for the balances of wages due to them, respectively, up to that date,

and prayed for the process of attachment against the barque, according to the practice of the court. This was issued, and, on the same day, the marshal returned on the writ, "Attached the barque Royal Saxon, and found a sheriff's officer on board, claiming to have her in custody." The captain appeared to this libel, and filed an answer admitting the demands of the seamen.

On the 25th January he exhibited a petition to the District Court, in which he represented the pendency of the suits in attachment and in admiralty; that the barque was liable to him for advances; that she was subject to heavy charges, and could not be employed to carry freight; and therefore he, with the approbation of the British consul, which accompanied the petition, solicited an order of sale for the benefit of all persons interested. This order was granted by the District Court, after due inquiry, on the 9th February, 1848, and was executed the 15th of February, 1848, by the marshal of the court, at which time the defendant in the replevin was the purchaser, who took the possession of the vessel, and held her until retaken in this replevin suit of Ward & Co. Upon the trial of the replevin cause at *nisi prius*, the defendant solicited instructions to the jury, which were refused by the court, and the court instructed the jury unfavorably to his title. From the instructions asked, and the charge delivered, a selection is made, to exhibit the questions decided. The court was requested to charge—

3. "That when the lien of a mariner for wages is sought to be enforced in the admiralty by libel, and the marshal has attached the vessel under such proceedings, the vessel so attached is in the exclusive custody of the admiralty until the claims of the libellants have been adjudicated, or the vessel relieved by order of the court, on stipulation or otherwise; and such exclusive custody exists, notwithstanding a previous foreign attachment from a court of law served on the vessel by the sheriff."

5. "That a foreign attachment is not properly a proceeding *in rem;* but an attachment from the admiralty on a libel for mariners' wages is *in rem;* and the legal possession acquired by the sheriff, on service of the writ of foreign attachment, is ended, superseded, or suspended, by the service of such attachment from the admiralty."

8. "That when, on the 21st of January, 1848, the Royal Saxon was attached under the process issued on the libel for mariners' wages, she came by virtue of that attachment into the exclusive custody of the court of admiralty; and such exclusive legal custody continued from the 21st January, 1848, until the sale by the marshal, by order of that court, on the 15th February, 1848."

10. "That the legal possession of the vessel being exclusively in the admiralty court from the 21st January, 1848, till the sale made, by order of that court, on the 15th February, 1848, the sale by the sheriff on the 9th February, 1848, gave no title to the purchaser as against the sale by the marshal."

The court refused so to instruct the jury, but charged them: "That the court of admiralty could not proceed against the vessel while she remained in the custody of an independent and competent jurisdiction; that the presence of the marshal on the ship did not prove his custody, for the sheriff's officer was there before him; that the marshal did not dispossess the sheriff, but prudently retired himself, and informed the court in his return that the vessel was in the custody of the sheriff; that if the sheriff first took possession of the vessel, and maintained it until she was sold to the plaintiffs, they had the better title; and that the fact of the continuing possession of the sheriff was for the jury." A verdict was returned in favor of the plaintiffs, upon which a judgment was rendered in the Supreme Court in their favor, confirming the opinion of the judge as expressed to the jury at *nisi prius.*

The judgment of the District Court allowing the order of sale proceeded upon the grounds: "That the suits in attachment in the Supreme Court applied to alleged interests in the vessel, not to the vessel itself. The attachment creditor, if he succeeds in his suit, obtains recourse against the thing attached just so far as his defendant had interest in it, and no farther. The rights of third parties remain in both cases unaffected. The bottomry creditor, residing, it may be, in a foreign country, is no party to either proceeding, and loses none of his rights. His contract was with the thing, not the owner, and it is therefore not embarrassed, and cannot be, by any question or contest of ownership. So, too, seamen, whoever owns the vessel, or how often soever the ownership may be changed, wherever she may go, whatever may befall her—so long as a plank remains of her hull, the seamen are her first creditors, and she is privileged to them for their wages," &c., &c.

Again: "What interest in the ship," asks the District Court, "does the sheriff propose to sell? Not a title to it, but the defendant's property in it, whatever it may be. Not so in the admiralty. Here the subject-matter of the controversy is the *res* itself. It passes into the custody of the court. All the world are parties, and the decree concludes all outstanding interests, because all are represented. Here they are marshalled in their order of title and privilege. There is no difficulty in allowing an arrest by the admiralty, notwithstanding the vessel or some interest in it has passed into the

custody of the sheriff. He retains all his rights, notwithstanding the marshal's intervention. The proceedings against the vessel, the thing, the subject of the property or title, may still go on in the admiralty. The sheriff's vendee of the ship may intervene there, as the defendant might have done in this court; he may make defence to the proceeding there as the successor to the defendant's rights, and may be substituted ultimately before the judge of the admiralty as a claimant of the surplus fund."

This cause has been regarded in this court as one of importance. It has been argued three different times at the bar, and has received the careful consideration of the court. The deliberations of the court have resulted in the conviction that the question presented in the cause is not a new question, and is not determinable upon any novel principle, but that the question has come before this and other courts in other forms, and has received its solution by the application of a comprehensive principle which has recommended itself to the courts as just and equal, and as opposing no hindrance to an efficient administration of the judicial power.

In Payne *v.* Drew, 4 East., 523, Lord Ellenborough said: "It appears to me, therefore, not to be contradictory to any cases nor any principles of law, and to be mainly conducive to public convenience and to the prevention of fraud and vexatious delay in these matters, to hold that where there are several authorities equally competent to bind the goods of a party, when executed by the proper officer, that they shall be considered as effectually and for all purposes bound by the authority which first actually attaches upon them in point of execution, and under which an execution shall have been first executed."

This rule is the fruit of experience and wisdom, and regulates the relations and maintains harmony among the various superior courts of law and of chancery in Great Britain.

Those courts take efficient measures to maintain their control over property within their custody, and support their officers in defending it with firmness and constancy. The court of chancery does not allow the possession of its receiver, sequestrator, committee, or custodee, to be disturbed by a party, whether claiming by title paramount or under the right which they were appointed to protect, (Evelyn *v.* Lewis, 3 Hare, 472; 5 Madd., 406,) as their possession is the possession of the court. (Noe *v.* Gibson, 7 Paige, 713.) Nor will the court allow an interfering claimant to question the validity of the orders under which possession was obtained, on the ground that they were improvidently made. (Russell *v.* East Anglien R. Co., 3 McN.

and Gord., 104.)    The courts of law uphold the right of their officers to maintain actions to recover property withdrawn from them, and for disturbance to them in the exercise of the duties of their office.

But it is in this court that the principle stated in Payne *v.* Drew has received its clearest illustration, and been employed most frequently, and with most benignant results.    It forms a recognised portion of the duty of this court to give preference to such principles and methods of procedure as shall serve to conciliate the distinct and independent tribunals of the States and of the Union, so that they may co-operate as harmonious members of a judicial system coextensive with the United States, and submitting to the paramount authority of the same Constitution, laws, and Federal obligations.    The decisions of this court that disclose such an aim, and that embody the principles and modes of administration to accomplish it, have gone from the court with authority, and have returned to it, bringing the vigor and strength that is always imparted to magistrates, of whatever class, by the approbation and confidence of those submitted to their government.    The decision in the case of Hagan *v.* Lucas, 10 Pet., 400, is of this class.    It was a case in which a sheriff had seized property under valid process from a State court, and had delivered it on bail to abide a trial of the right to the property, and its liability to the execution.    The same property was then seized by the marshal, under process against the same defendant.    This court, in their opinion, say: "Where a sheriff has made a levy, and afterwards receives executions against the same defendant, he may appropriate any surplus that shall remain, after satisfying the first levy by the order of the court.    But the same rule does not govern when the executions, as in the present case, issue from different jurisdictions.    The marshal may apply moneys collected under different executions, the same as the sheriff. But this cannot be done as between the marshal and the sheriff; a most injurious conflict of jurisdiction would be likely often to arise between the Federal and the State courts, if the final process of the one could be levied on property which had been taken on process of the other.    The marshal or the sheriff, as the case may be, by a levy acquires a special property in the goods, and may maintain an action for them.    *But if the same goods may be taken in execution by the marshal and the sheriff, does this special property vest in the one or the other, or both of them?*    No SUCH CASE CAN EXIST; property once levied on remains in the custody of the law, and is not liable to be taken by another execution in the hands of a different officer, and especially by an officer acting under another jurisdiction."    The principle

contained in this extract from the opinion of the court was applied by this court to determine the conflicting pretensions of creditors by judgment in a court of the United States, and an administrator who has declared the insolvency of his estate, and was administering it under the orders of a probate court, (8 How. S. C. R., 107,) in a controversy between receivers and trustees holding under a court of chancery, and judgment creditors seeking their remedy by means of executory process, (14 How. S. C. R., 52, 368,) and to settle the priorities of execution creditors of distinct courts. (Pulliam *v.* Osborn, 17 How., 471.)

In a case not dissimilar in principle from the present, the principle was applied in favor of the Executive department, having property in custody whose possession was disturbed by a State officer under judicial process. An attachment from a State court was levied upon merchandise imported, but not entered at the custom-house, and the validity of the levy was the question involved. (Harmar *v.* Dennie, 3 Pet., 292.) The court say: "From their arrival in port, the goods are, in legal contemplation, in the custody of the United States. An attachment of such goods presupposes a right to take the possession and custody, and to make such possession and custody exclusive. If the officer attaches upon *mesne* process, he has the right to hold the possession to answer the exigency of the writ. The act of Congress recognises no such authority, and admits of no such exercise of right." To the argument, that the United States might hold for the purpose of collecting duties, and the sheriff might attach the residuary right, subject to the prior claim, the court say: "The United States have nowhere recognised or provided for a concurrent possession or custody by any such officer."

A recognition of the same principle is to be found in Peck *v.* Jenness, 7 How. S. C. R., 612. An act of Congress had conferred on the courts of the United States exclusive jurisdiction "of all suits and proceedings of bankruptcy," and had provided that the act should not be held to impair or destroy existing rights, liens, mortgages, &c., &c., on the estate of the bankrupt. A District Court of the United States decided that its jurisdiction extended to administer the entire estate of the bankrupt court, and that the liens on the property, whether judicial or consensual, must be asserted exclusively in that court, and that all other jurisdictions had been superseded. This court denied the pretension of the District Court, and affirmed, "That when a court has jurisdiction, it has a right to decide every question which occurs in the cause; and when the jurisdiction of the court and the right of the plaintiff to

prosecute his suit has once attached, that right cannot be arrested or taken away by proceedings in another suit. These rules have their foundation not merely in comity, but in necessity; for if one may enjoin, the other may retort, by injunction, and thus the parties be without remedy, being liable to a process for contempt in one, if they dare to proceed in the other. Neither can one take property from the custody of the other by replevin, or any other process, for this would produce a conflict extremely embarrassing to the administration of justice."

The legislation of Congress, in organizing the judicial powers of the United States, exhibits much circumspection in avoiding occasions for placing the tribunals of the States and of the Union in any collision. A limited number of cases exist, in which a party sued in a State court may obtain the transfer of the cause to a court of the United States, by an application to the State court in which it was commenced; and this court, in a few well-defined cases, by the twenty-fifth section of the judiciary act of 1789, may revise the judgment of the tribunal of last resort of a State. In all other respects the tribunals of the State and the Union are independent of one another. The courts of the United States cannot issue "an injunction to stay proceedings in any court of a State," and the judiciary act provides that "writs of *habeas corpus* shall in no case extend to prisoners in jail, unless where they are in custody under or by color of authority of the United States, or are committed for trial before some court of the same, or are necessary to be brought into court to testify." "Thus, as the law now stands," say this court, "an individual who may be indicted in a Circuit Court for treason against the United States is beyond the power of the Federal courts and judges, if he be in custody under the authority of a State." (Ex parte Dorr, 3 How. S. C. R., 103.) And signal instances are reported in verification of the above statement. (Ex parte Robinson, 6 McLean R., 355.)

This inquiry will not be considered as irrelevant to the question under the consideration of the court. The process of foreign attachment has been for a long time in use in Pennsylvania, and its operation is well defined, by statute as well as judicial precedents. The duties of the sheriff, under that process, are identical with those of a marshal, holding an attachment from the District Court sitting in admiralty. "The goods and chattels of the defendant, in the attachment, (such is the language of the statute,) in the hands of the garnishee, shall, after such service, be bound by such writ, and be in the officer's power; and if susceptible of seizure or manual occu-

pation, the officers shall proceed to secure the same, to answer and abide the judgment of the court in that case, unless the person having the same shall give security. (Purdin's Dig., 50, sec. 50; 5 Whar., 125; Carryl v. Taylor, 12.)

It follows, by an inevitable induction from the cases of Harmar v. Dennie, 3 Pet., 299; Hagan v. Lucas, 10 Pet., 400; and Peck v. Jenness, 7 How., 612, that the custody acquired through the "seizure or manual occupation" of the Royal Saxon, under the attachment by the sheriff of Philadelphia county, could not legally be obstructed by the marshal, nor could he properly assert a concurrent right with him in the property, unless the court of admiralty holds some peculiar relation to the State courts or to the property attached, which authorized the action or right of its marshal. The relation of the District Courts, as courts of admiralty, is defined with exactness and precision by Justice Story in his Commentaries on the Constitution. He says: "Mr. Chancellor Kent and Mr. Rawle seem to think that the admiralty jurisdiction given by the Constitution is, in all cases, necessarily exclusive. But it is believed that this opinion is founded on mistake. It is exclusive in all matters of prize, for the reason that, at the common law, this jurisdiction is vested in the courts of admiralty, to the exclusion of the courts of common law. But in cases where the jurisdiction of common law and admiralty are concurrent, (as in cases of possessory suits, mariners' wages, and marine torts,) there is nothing in the Constitution necessarily leading to the conclusion that the jurisdiction was intended to be exclusive; and there is no better ground, upon general reasoning, to contend for it. The reasonable interpretation," continues the commentator, "would seem to be, that it conferred on the national judiciary the admiralty and maritime jurisdiction exactly according to the nature and extent and modifications in which it existed in the jurisprudence of the common law. When the jurisdiction was exclusive, it remained so; when it was concurrent, it remained so. Hence the States could have no right to create courts of admiralty as such, or to confer on their own courts the cognizance of such cases as were exclusively cognizable in admiralty courts. But the States might well retain and exercise the jurisdiction in cases of which the cognizance was previously concurrent in the courts of common law. This latter class of cases can be no more deemed cases of admiralty and maritime jurisdiction than cases of common-law jurisdiction." (3 Story's Com., sec. 1666, note.)

In conformity with this opinion, the habit of courts of common law has been to deal with ships as personal property, subject in the main, like other personal property, to municipal

authority, and liable to their remedial process of attachment and execution, and the titles to them, or contracts and torts relating to them, are cognizable in those courts.

It has not been made a question here that the Royal Saxon could not be attached, or that the title could not be decided in replevin. But the District Court seems to have considered that a ship was a juridical person, having a *status* in the courts of admiralty, and that the admiralty was entitled to precedence whenever any question arose which authorized a judicial tribunal to call this legal entity before it. The District Court, in describing the source of its authority, says of the contract of bottomry, that " it is made with the thing, and not the owner," and that the contract of the mariners is similar; that the RES " represents " in that court all persons having a right and privilege, while the rights of the owner are treated there as something incorporeal, separable from the res, and which might be seized by the sheriff, even though the res might be in the ad miralty. This representation is not true in matter of fact, nor in point of law. Contracts with mariners for service, and other contracts of that kind, are made on behalf of owners who incur a personal responsibility; and if lenders on bottomry depend upon the vessel for payment, it is because the liability of the owner is waived in the contract itself. " In all causes of action," says the judge of the admiralty of Great Britain, " which may arise during the ownership of the persons whose ship is pro ceeded against, I apprehend that no suit could ever be maintained against a ship, where the owners were not themselves personally liable, or where the liability had not been given up." (The Druid, 1 Wm. Rob, 399.) And the opinion of this court in The Schooner Freeman *v.* Buckingham, 18 How., 183, was to the same effect.

In courts of common law, the forms of action limit a suit to the persons whose legal right has been affected, and those who have impaired or injured it. In chancery, the number of the parties is enlarged, and all are included who are interested in the object of the suit; and as the parties are generally known, they are made parties by name and by special notice.

In admiralty, all parties who have an interest in the *subject* of the suit—the *res*—may appear, and each may propound in dependently his interest. The seizure of the RES, and the publication of the monition or invitation to appear, is regarded as equivalent to the particular service of process in the courts of law and equity. But the RES is in no other sense than this the representative of the whole world. But it follows, that to give jurisdiction *in rem*, there must have been a valid seizure and an actual control of the ship by the marshal of the court;

and the authorities are to this effect. (Jennings *v.* Curson, 4 Cr., 2; 2 Ware's Adm. R., 362.) In the present instance, the service was typical. There was no exclusive custody or control of the barque by the marshal, from the 21st of January, 1848, to the day of the sale; and when the order of sale was made in the District Court, she was in the actual and legal possession of the sheriff.

The case of the Oliver Jordan, 2 Curtis's R., 414, was one of a vessel attached by a sheriff in Maine, under process from the Supreme Court. She was subsequently libelled in the District Court of the United States, upon the claim of a material man. The District Court sustained the jurisdiction of the court. But on appeal the exception to the jurisdiction was allowed, and the decree of the District Court reversed. Mr. Justice Curtis observed: "This vessel being in the custody of the law of the State, the marshal could not lawfully execute the warrant of arrest." In the case of the ship Robert Fulton, 1 Paine C. C. R., 620, the late Mr. Justice Thompson held that the warrant from the admiralty could not be lawfully executed under similar circumstances, and that the District Court could not proceed *in rem*. The same subject has been considered by State courts, and their authority is to the same effect. (Keating *v.* Spink, 3 Ohio R., N. S., 105; Carryl *v.* Taylor, 12 Harris, 264.)

Our conclusion is, that the District Court of Pennsylvania had no jurisdiction over the Royal Saxon when its order of sale was made, and that the sale by the marshal was inoperative.

The view we have taken of this cause renders it unnecessary for us to consider any question relative to the respective liens of the attaching creditors, and of the seamen for wages, or as to the effect of the sale of the property as chargeable or as perishable upon them.

Our opinion is, that there is no error in so much of the record of the Supreme Court of Pennsylvania as is brought before this court by the writ of error, and the judgment of the court is consequently affirmed.

Mr. Chief Justice TANEY, Mr. Justice WAYNE, Mr. Justice GRIER, and Mr. Justice CLIFFORD, dissented.

Mr. Justice WAYNE, Mr. Justice GRIER, and Mr. Justice CLIFFORD, concurred with Mr. Chief Justice TANEY in the following dissenting opinion:

Mr. Chief Justice TANEY dissenting:

I dissent from the opinion of the court. The principle upon which the case is decided is so important, and will operate so

widely, that I feel it my duty to show the grounds upon which I differ. This will be done as briefly as I can; for my object is to state the principles of law upon which my opinion is formed, rather than to argue them at length.

The opinion of the court treats this controversy as a conflict between the jurisdiction and rights of a State court, and the jurisdiction and rights of a court of the United States, as a conflict between sovereignties, both acting by their own officers within the spheres of their acknowledged powers. In my judgment, this is a mistaken view of the question presented by the record. It is not a question between the relative powers of a State and the United States, acting through their judicial tribunals, but merely upon the relative powers and duties of a court of admiralty and a court of common law in the case of an admitted maritime lien. It is true that the court of admiralty is a court of the United States, and the court of common law is a court of the State of Pennsylvania. But the very same questions may arise, and indeed have arisen, where both courts are created by and acting under the same sovereignty. And the relative powers and duties of a court of admiralty and a court of common law can upon no sound principles be different, because the one is a court of the United States and the other the court of a State. The same rules which would govern under similar circumstances, where the process of attachment or a *fieri facias* had issued from a Circuit Court of the United States exercising a common-law jurisdiction, must govern in this case. The court of admiralty and court of common law have each their appropriate and prescribed sphere of action, and can never come in conflict, unless one of them goes outside of its proper orbit. And a court of common law, although acting under a State, has no right to place itself within the sphere of action appropriated peculiarly and exclusively to a court of admiralty, and thereby impede it in the discharge of the duties imposed upon it by the Constitution and the law.

There are some principles of law which have been so long and so well established that it is sufficient to state them without referring to authorities.

The lien of seamen for their wages is prior and paramount to all other claims on the vessel, and must be first paid.

By the Constitution and laws of the United States, the only court that has jurisdiction over this lien, or authorized to enforce it, is the court of admiralty, and it is the duty of that court to do so.

The seamen, as a matter of right, are entitled to the process of the court to enforce payment promptly, in order that they

may not be left penniless, and without the means of support on shore. And the right to this remedy is as well and firmly established as the right to the paramount lien.

No court of common law can enforce or displace this lien. It has no jurisdiction over it, nor any right to obstruct or interfere with the lien, or the remedy which is given to the seaman.

A general creditor of the ship-owner has no lien on the vessel. When she is attached (as in this case) by process from a court of common law, nothing is taken, or can be taken, but the interest of the owner remaining after the maritime liens are satisfied. The seizure does not reach them. The thing taken is not the whole interest in the ship. And the only interest which this process can seize is a secondary and subordinate interest, subject to the superior and paramount claims for seamen's wages; and what will be the amount of those claims, or whether anything would remain to be attached, the court of common law cannot know until they are heard and decided upon in the court of admiralty.

I do not understand these propositions to be disputed.

Under the attachment, therefore, which issued from the common-law court of Pennsylvania, nothing was legally in the custody of the sheriff but the interest of the owner, whatever it might prove to be, after the liens were heard and adjudicated in the only court that could hear and determine them. The common-law process was not and could not be a proceeding *in rem*, to charge the ship with the debt, for the creditor has no lien upon her, and the court had no jurisdiction over anything but the owner's residuum.

The whole ship could not be sold by them, so as to convey an absolute right of property to the purchaser. And even what was seized was not taken to subject it to the payment of the debt, but merely to compel the owner to appear personally to a suit brought against him *in personam* in the court which issued the process of attachment. It was ancillary to the suit against him personally, and nothing more. The vessel would be released from the process, and restored to him, as soon as he gave bail and appeared to the suit; and she would be condemned and sold only upon his refusal to appear. But, according to the laws of the State and the practice of the common-law court, twelve months or more might elapse before the vessel was either sold or released from the process.

The question, then, is simply this: can a court of common law, having jurisdiction of only a subordinate and inferior interest, shut the doors of justice for twelve months or more against the paramount and superior claims of seamen for wages

due, and prevent them from seeking a remedy in the. only court that can give it? I think not. And if it can be done, then the paramount rights of seamen for wages, so long and so constantly admitted, is a delusion. ' The denial of the remedy for twelve months or more after the ship has arrived is equivalent, in its effect upon them, to a denial of the lien; substantially and practically it would amount to the same thing. And it is equally a denial of the right of the court of admiralty to exercise the jurisdiction conferred on it by the Constitution and laws of the United States.

Now it is very clear, that if this ship had been seized by process from a common-law court of the United States for a debt due from the owner, the possession of the marshal under that process would have been superseded by process from the admiralty upon a preferred maritime lien. This I understand to be admitted. And if it be admitted, I do not see how the fact that this process was from a common-law court of a State, and served by its own officer, can make any difference; for the common-law court of a State has no more right to impede the admiralty in the exercise of its legitimate and exclusive powers, than a common-law court of the United States. And the sheriff, who is the mere ministerial officer of the court of common law, can have no greater power or jurisdiction over the vessel than the court whose process he executes. He seizes what the court had a right to seize; he has no right of possession beyond it; and if the interest over which the court has jurisdiction is secondary and subordinate to the interest over which the admiralty has exclusive jurisdiction, his possession is secondary and subordinate in like manner, and subject to the process on the superior and paramount claim. It is the process and the authority of the court to issue it that must determine who has the superior right. And if the one is to enforce a right paramount and superior to the other, it is perfectly immaterial whether the first process was served by a sheriff or the marshal. Nor does it make any difference when they are served by different officers of different courts. In the case of the Flora, 1 Hagg., 298, the vessel had been seized by a sheriff upon process from the Court of King's Bench. She was afterwards, and while in possession of the sheriff, arrested upon process from the admiralty on a prior maritime lien, and was sold by the marshal while the sheriff still held her under the common-law process. The sale by the marshal was held to be valid by the King's Bench. It is true, that the creditor at whose suit the vessel was seized by the sheriff consented to the sale, and claimed to come in for the surplus after paying the maritime lien. But if the marshal could not lawfully ar-

rest while she was in the possession of the sheriff, he could not lawfully sell under that arrest, nor while the sheriff still held possession, and no consent of parties would make it a valid marshal's sale, and give a good title to the purchaser, if the sale was without authority of law. The validity of these proceedings was brought before the courts by the ship-owner, and earnestly litigated. The Court of King's Bench sanctioned the sale, not upon the ground that the creditor consented to it, but upon the ground that the marshal acted under a court of competent authority, (see note 301,) and they refused to interfere with the surplus which remained after payment of seamen's wages, which had been paid into the registry of the admiralty, even in behalf of the creditor who had seized under their own process. The King's Bench do not seem to have supposed there was any conflict of jurisdiction in the case, or that their process or officer had been improperly interfered with by the marshal, nor did the King's Bench hold that there was any incongruity in the possession of the sheriff and the marshal at the same time. On the contrary, it was conceded on all hands that the possession of the sheriff was no obstacle to the arrest by the marshal, nor any impediment in the way of the admiralty, when exercising its appropriate and exclusive jurisdiction, in enforcing claims prior and superior to that of the attaching creditor. Is there any substantial difference between that case and the one before us? I can see none.

Chancellor Kent, in his Commentaries, states the principle with his usual precision and clearness, and in a few words. In vol. 1st, 380, speaking of the lien for seamens' wages, he says: "The admiralty jurisdiction is essential in all such cases, for the process of a court of common law cannot directly touch the thing *in specie.*" And in my judgment the process of the court of common law in this case did not touch the interest of the seamen in the ship.

But it seems, however, to be supposed, that the circumstance that the common-law court was the court of a State, and not of the United States, distinguishes this case from that of the Flora, and is decisive in this controversy. And it is said that the Royal Saxon, being in possession of an officer of a State court, under process from the court, she was in the possession of an officer of another sovereignty, and was in the custody of its law, and that no process could be served upon her, issuing from the court of a different sovereignty, without infringing upon the rights of the State, and bringing on unavoidably a conflict between the United States and the State.

If, by another and different sovereignty, it is meant that the power of the State is sovereign within its sphere of action, as

marked out by the Constitution of the United States, and that no court or officer of the United States can seize or interfere with property in the custody of an officer of a State court, where the property and all the rights in it are subject to the control of the judicial authorities of the State, nobody will dispute the proposition. But if it is intended to say that, in the administration of judicial power, the tribunals of the States and the United States are to be regarded as the tribunals of separate and independent sovereignties, dealing with each in this respect upon the principles which govern the comity of nations, I cannot assent to it. The Constitution of the United States is as much a part of the law of Pennsylvania as its own Constitution, and the laws passed by the General Government pursuant to the Constitution are as obligatory upon the courts of the States as upon those of the United States; and they are equally bound to respect and uphold the acts and process of the courts of the United States, when acting within the scope of its legitimate authority. And its courts of common law stand in the same relation to the courts of admiralty, in the exercise of their judicial powers, as if they were courts of common law of the United States. The Constitution and the laws, which establish the admiralty courts and regulate their jurisdiction, are a part of the supreme law of the State; and the State could not authorize its common-law courts to issue any process, or its officers to execute it, which would impede or prevent the admiralty court from performing the duties imposed upon it, on exercising the power conferred on it by the Constitution and laws of the United States. The State courts have not, and cannot have, any jurisdiction in admiralty and maritime liens, to bring them into conflict with the courts of the United States. This principle appears to me to rest on the clear construction of the Constitution, and has been maintained by eminent jurists.

Precisely the same question now decided came before the Circuit Court of Massachusetts twenty years ago, in the case of certain logs of mahogany, Thomas Richardson, claimant, reported in 2d Sumn., 589; and also before the District Court of the State of Maine, thirty years ago, in the case of Poland et al. *v.* the freight and cargo of the brig Spartan, reported in Ware's Rep., 143; and in both of these cases the point was fully considered and decided by the court; and in both it was held that a previous seizure under a process of attachment from a State court could not prevent the admiralty from proceeding *in rem* to enforce the preferred liens of which it has exclusive jurisdiction.

In the case in the Circuit Court of Massachusetts, Mr. Justice

Story says: "A suit in a State court by replevin or by attachment can never be admitted to supersede the right of a court of admiralty to proceed by a suit *in rem*, to enforce a right against that property, to whomsoever it may belong. The admiralty does not attempt to enter into any conflict with the State court, as to the just operation of its own process; but it merely asserts a paramount right against all persons whatever, whether claiming above or under the process. No doubt can exist that a ship may be seized under admiralty process for a forfeiture, notwithstanding a prior replevin or attachment of the ship then pending. The same thing is true as to the lien on a ship for seamen's wages, or a bottomry bond."

I quote the words of Mr. Justice Story, because he briefly and clearly states the principle upon which the jurisdiction of the respective courts is regulated, and upon which I think this case ought to be decided. The Constitution and laws of the United States confer the entire admiralty and maritime jurisdiction expressly upon the courts of the General Government. And admiralty and maritime liens are therefore outside of the line which marks the authority of a common-law court of a State, and excluded from its jurisdiction. And if a common-law court sells the vessel to which the lien has attached, upon condemnation, to pay the debt, or on account of its perishable condition, it must sell subject to the maritime liens, and they will adhere to the vessel in the hands of the purchaser, and of those claiming under him.

Upon what sound principle, then, of judicial reasoning can it be maintained, that although the process of a common-law court cannot reach the maritime liens, yet, by laying hold of some other interest, it can withdraw them from admiralty for an indefinite period of time? It cannot issue its mandate to the admiralty, not to proceed upon those liens; but, according to the present decision, it may take the lien out of its power and out of its jurisdiction. I cannot be persuaded that a court which, by the Constitution of the United States, has no jurisdiction over the subject-matter—that is, the maritime lien—can directly or indirectly prevent or delay the court which, by the Constitution, has exclusive jurisdiction, from fulfilling its judicial duty, or the seamen from pursuing their remedy, where alone they can obtain it.

But the decision of this court in the case of Hagan *v.* Lucas, 10 Pet., 400, it is said, is the same in principle, and must govern the case now before us. If this were the case, I should yield to its authority, however reluctant I might feel to do so. But in my judgment the point decided in that case has no analogy whatever to the questions arising in this

In the case of Hagan *v.* Lucas, a judgment had been obtained in the State court of Alabama against certain defendants, and an execution issued, upon which certain slaves were seized by the sheriff as the property of the defendants. Lucas, the defendant in this writ of error, claimed the property as belonging to him; and, under a statute of Alabama, the property was restored to him by the sheriff, upon his giving bond for the forthcoming of the slaves, if it should be found that they were the property of the persons against whom the execution was issued. And proceedings were thereupon had, to try before the court the right of property, according to the provisions of the State law. Pending these proceedings, a judgment was obtained in the District Court of the United States against the same defendants; and an execution issued, which the marshal levied on the same property that had been seized by the sheriff. Lucas thereupon appeared in court, and again claimed the slaves as belonging to him, and at the trial exhibited proof that the proceedings to try the right of property under the sheriff's levy were still pending and undetermined in the State court. Both the court below and this court held, that under these circumstances the property could not be taken in execution by the marshal upon process from the District Court of the United States.

But what was the principle upon which that case turned? and what resemblance has it to the questions we are now called on to consider?

Here were two courts of common law, exercising the same jurisdiction, within the same territorial limits, and both courts governed by the same laws. Neither court had any peculiar or exclusive jurisdiction over the property in question, nor of any peculiar right or lien upon it. The State court had the same power with the District Court to hear and decide any question that might arise as to the rights of property of any person, and to protect any liens and priorities of payment to which the property or its proceeds were liable. In a word, they were courts of concurrent and co-ordinate jurisdiction over the subject-matter; and if the plaintiff in the District Court had any preferred interest in the property, or any superior or prior claim, he could have asserted that claim in the State court, and have obtained there the same remedy and the same protection of his rights, and as effectually and speedily, as the court of the United States could have afforded him.

And this court, in deciding the case, did nothing more than adhere to a rule which, I believe, is universally recognised by courts of justice—that is, that between courts of concurrent jurisdiction, the court that first obtains possession of the con-

troversy, or of the property in dispute, must be allowed to dispose of it finally, without interference or interruption from the co-ordinate court. And this rule applies where the concurrent jurisdictions are two courts of the United States or two courts of a State, or one of them the court of a State and the other a court of the United States. It was no new question when the case of Hagan *v.* Lucas came before this court; but an old and familiar one, upon which courts of concurrent jurisdiction have necessarily uniformly acted, in order to prevent indecorous and injurious conflicts between courts in the administration of justice. Indeed, this principle seems hardly to have been disputed in that case. The arguments of counsel are not given in the report. But, judging from the opinion delivered by the court, the main question seems to have been, whether the slaves were not released from execution by the bond given by Lucas, and the bond substituted in their place. The court, under the authority of a case decided in the State court of Alabama, held that they were not released from the sheriff's levy, and therefore applied the familiar rule in relation to courts of concurrent jurisdiction.

But how can the case of Hagan *v.* Lucas influence the decision of this? If Pennsylvania had an admiralty or any other court with jurisdiction over maritime liens, and the attaching creditor had proceeded in that court, undoubtedly the same principle would apply. But the State has no such court, and can have none such under the Constitution of the United States. The jurisdiction of the District Court is exclusive on that subject, and the line of division between that and the courts of common law is plainly and distinctly drawn. And when the District Court proceeded to enforce the lien for seamen's wages, it interfered with no right which the creditor had acquired under the process of attachment, nor with any right of property, subject to State jurisdiction; and when the District Court, acting within its exclusive and appropriate jurisdiction, proceeded to enforce the preferred and superior right of seamen's wages, it claimed no superiority over the State court; it merely exercised a separate and distinct jurisdiction. It displaced no right which the attaching creditor had acquired under the State process, nor in any degree lessened his security. Nor did it interfere with any right over which the State court had jurisdiction. If the liens were paid without sale, his attachment still held the ship. If she was sold, his right, whatever it was, adhered to the surplus, if any remained after discharging the liens. And if the State court passed judgment of condemnation in his favor, he would be entitled to receive from the registry of the admiralty whatever was awarded him by the State court,

if there was surplus enough after paying the superior and preferred claims for maritime liens. I can see no conflict of jurisdiction; nor can there be any, if each tribunal confines itself to its constitutional and appropriate jurisdiction.

But my brethren of the majority seem to suppose, that the principle decided in Hagan v. Lucas goes farther than I understand it; and that it has established the principle, that where a ship, within the limits of a State, is attached by an officer of a State, under process from a State court, no process can be served upon it from a District Court of the United States, while it is held under attachment by the sheriff; and that the sheriff might lawfully repel the marshal, if he attempted to serve a process *in rem*, although it was issued by the District Court of the United States, to enforce a paramount and a superior claim, for which the ship was liable, and which the District Court had the exclusive right to enforce, and over which the State court had not jurisdiction.

If this be the principle adopted by this court, and be followed out to its necessary and legitimate results, it must lead them further, I am convinced, than they are prepared to go. For it might have happened, that after this vessel was seized by the sheriff, and while she remained in his possession, it was discovered that she was liable to forfeiture, or had incurred some pecuniary penalty which was by law a lien upon her, and process issued by the District Court to arrest her, in order to enforce the penalty or forfeiture. In such a case, no one, I presume, would think that the sheriff had a right to keep out the marshal, and prevent him from arresting the ship; nor would such an arrest, I presume, be regarded as a violation of the sovereignty of the State, nor an illegal interference with the process or jurisdiction of its courts. Yet if it be admitted that the marshal may under such process lawfully take possession and control of the vessel, upon what principle of law does it stand? Simply upon this: that the rights of the United States under the Constitution are paramount and superior to the right of the attaching creditor. And as the District Court has exclusive jurisdiction to decide upon them, and enforce them, and the State court no jurisdiction over them, the State court cannot lawfully interfere with the process of the District Court, when exercising its exclusive jurisdiction to enforce and maintain this paramount and superior right.

But is not the claim for mariners' wages superior and paramount to the claim of the general creditor, at whose suit the attachment issued? Has not the District Court the exclusive power to enforce and maintain this right, and is not the State court without jurisdiction upon the subject? It is true, that

the seaman's right is not regarded as of equal dignity and importance with the rights of the United States. But if the proposition be true, that after the vessel was seized by the sheriff she was in the custody of the law of the State, and no process from the District Court would authorize the marshal to arrest her, although it was issued upon a higher and superior right, for which the ship was liable, and over which the State court had no jurisdiction, the proposition must necessarily embrace process to enforce the superior and prior rights of the United States, as well as the superior and privileged rights of individuals; for the District Court has no right to trespass upon the sovereign and reserved rights of a State, or to interfere unlawfully with the process of its courts, because the United States are the libellants, and the process issued at their instance. In this respect, the United States have no greater right than an individual. And if the Royal Saxon might have been arrested by the marshal to enforce the higher and superior right of the United States in the appropriate court, I can see no reason why he might not upon the same grounds make the arrest to enforce and protect the higher and superior right to mariners' wages. I think it will be difficult to draw any clear line of distinction between them, and, in my opinion, the process may be lawfully executed by the marshal in either case. I agree with the majority of my brethren in regarding it as among the first duties of every court of the United States carefully to avoid trespassing upon the rights reserved to the States, or interfering with the process of their courts when they are exercising either their exclusive or concurrent jurisdiction in the matter in controversy. And with the high trusts and powers confided by the Constitution to the Supreme Court, it is more especially its duty to abstain from all such interference itself, and to revise carefully the judgments of the inferior courts of the United States whenever that question arises, and to reverse them if they exceed their jurisdiction. But I must add, that while in my judgment this court should be the last court in the Union to exercise powers not authorized by the Constitution, it should be the last court in the Union to retreat from duties which the Constitution and laws have imposed.

It has been suggested that this was a foreign ship, and the seamen foreign seamen, and that they are not therefore embraced in the act of Congress which gives a lien upon the vessel for seamen's wages. But this provision of the law was nothing more than an affirmance of the lien which was given by the maritime law in England from the earliest period of its commercial jurisprudence, and indeed by the maritime law of every nation engaged in commercial adventures. And the

English law was brought with them by the colonists when they migrated to this country, and was invariably acted on by every admiralty court, long before the act of Congress was passed.

It is true, that it is not in every case obligatory upon our courts of admiralty to enforce it in the case of foreign ships, and the right or duty of doing so is sometimes regulated with particular nations by treaty. But as a general rule, where there is no treaty regulation, and no law of Congress to the contrary, the admiralty courts have always enforced the lien where it was given by the law of the State or nation to which the vessel belonged. In this respect the admiralty courts act as international courts, and enforce the lien upon principles of comity. There may be, and. sometimes have been, cases in which the court, under special circumstances, has refused to interfere between the foreign seamen and ship-owner; but that is always a question of sound judicial discretion, and does not affect the jurisdiction of the court, and, like all questions resting in the judicial discretion of the court below, (such as granting or refusing a new trial, continuing a case, or quashing an execution,) it is not a subject for revision here, and furnishes no ground for appeal, or for impeaching the validity of the judgment. The District Court undoubtedly had jurisdiction of the case, if in its discretion it deemed it proper to exercise it.

Indeed, there appears to have been no special circumstances brought to the notice of the court to induce it, upon international considerations, not to interfere. There was no objection on the part of the foreign ship-owner or master; but, on the contrary, a general desire that the court should do so. And certainly this circumstance was not even adverted to in the State or District Court, and had no influence upon the opinions of either.

It is perhaps to be regretted that this question of jurisdiction did not arise between two courts of common law, but has arisen between the admiralty courts of the United States and a common-law court of the State. I am sensible, that among the highest and most enlightened minds, which have been nurtured and trained in the studies of the common law, there is a jealousy of the admiralty jurisdiction, and that the principles of the common law are regarded as favorable to personal liberty and personal rights, and those of the admiralty as tending in a contrary direction. And under the influence of this opinion, they are apt to consider any restriction upon the power of the latter as so much gained to the cause of free institutions. And as there is no admiralty jurisdiction reserved

to the States, and the administration of justice in their courts is confined to questions of common law and chancery, the studies and pursuits of the jurists in the States do not generally lead them to examine into the history and character of the admiralty jurisdiction; nor to inquire into its usefulness, and indeed necessity, in every country extensively engaged in commerce. Their opinions are naturally formed from common-law decisions, and common-law writings and commentaries. And no one has contributed more than Lord Coke to create these opinions. His great knowledge of the common law, displayed in his voluminous writings, has made him a high authority in all matters concerning the administration of justice. And every one who in early life has passed through the usual studies of the common law, feels the influence of his opinions afterwards, in all matters connected with legal inquiries. The firmness with which he resisted the encroachments of the Crown upon the liberty of the subject, in the reigns of James I and Charles I, has added to the weight of his opinions, and impressed them more strongly and durably upon the mind of the student. But before we receive implicitly his doctrines on the admiralty jurisdiction, it may be well to remember that in the case of Smart *v.* Wolf, 3 T. R., 348, where the opinions of Lord Coke were referred to upon a question of admiralty jurisdiction, Mr. Justice Buller said: "with respect to what is said relative to the admiralty jurisdiction in 4 Inst., 135, that part of Lord Coke's work has been always received with great caution, and frequently contradicted. He seems to have entertained not only a jealousy of, but an enmity against, the jurisdiction."

I need not speak of the weight to which this opinion is entitled, when judicially pronounced by Mr. Justice Buller in the King's Bench, in deciding a well-considered case then before the court.

Every one who has studied the history of English jurisprudence generally, and who has not confined his researches to the decisions of the common-law courts, and the commentaries of writers trained in them, is aware that a very grave contest existed for a long time, as to the relative jurisdictions of the Court of King's Bench and the admiralty after the passage of the statutes of Richard II, which are so often referred to. And this controversy was continued with unabated zeal on both sides after the passage of the statutes of Henry IV and Henry VIII, on the same subject.

It is not my purpose to discuss the points on which the courts differed. I refer to the controversy merely to show that the construction given to the English statutes by the

King's Bench, and which finally narrowed so much the jurisdiction of the English admiralty, was earnestly disputed at the time by many of the most distinguished jurists of the day. Indeed, the decisions of the King's Bench were by no means uniform, and the opinions of common-law judges on the subject widely differed. This appears by the opinion of the twelve judges, given to the King in Council, according to the usage of the English Government at that period of its history, and also by the ordinance of the Parliament in 1648, both of which materially differed from the decisions made before and afterwards in the King's Bench. I refer to these opinions particularly because they show, past doubt, that the construction placed upon the English statutes, now so confidently assumed to have been the admitted one at the time, was, in fact, for several generations, earnestly disputed by legal minds of the highest order, and was at length forced on the admiralty by the controlling power of the King's Bench; for, whatever justice or weight of argument there might be on the part of the construction of the admiralty judges, the power was in the King's Bench. It exercised not merely the ordinary appellate authority of a superior court, but it issued its prohibition, forbidding any other court to try a suit brought in it where the judges of the King's Bench denied the jurisdiction of the inferior court, and claimed the right to have the case tried before themselves.

How, and under what influences, such a power would be exercised, from the reign of Richard II to that of Henry VIII, we may readily imagine. It was a period when England was divided by the rival claims of the houses of York and Lancaster to the crown, and was often convulsed by civil wars, not upon questions of civil liberty or national policy, but merely to determine which of the claimants should be their king; and when the monarch who succeeded in fighting his way to the throne framed his policy, and appointed the officers, civil as well as military, with a view to maintain his own power, and destroy the hopes of his adversary, rather than with any desire to promote the liberties of the people, or establish an enlightened and impartial administration of justice in his courts. And as the king was presumed to preside in person in the King's Bench, and the judges held their offices at his pleasure, no reader of history will doubt the temper and spirit in which power was exercised.

But we are not left to conjecture on that subject. The same efforts and means that were successfully used to break down the court of admiralty, were also used at the same time, and by the same men, to restrict the powers of the court of chan-

cery, but not with the like·success. And the same reasons.
were assigned for it—that is, that.it proceeded upon the prin-
ciples and adopted the practice of the civil law, and had no
jury, and was on that account unfavorable to the principles
of civil liberty, whilst the proceedings ·at common law sup-
ported and cherished them. These hostile efforts against the
chancery continued until the reign of James I, and were made
with renewed vigor in the time of Lord Ellesmere, who was
appointed Lord Keeper by Queen Elizabeth, and Chancellor
by James I.

A brief passage from the life of Lord Chancellor Ellesmere,
by Lord Campbell, will tell us how far the earlier decisions of
the Courts of King's Bench on the statutes of Richard II, Hen-
ry IV, and Henry VIII, which are so often pressed upon us,
ought to be respected as just interpretations of these statutes,
and also how far we ought to regard those judges as high and
impartial jurists, seeking only to maintain free institutions
when they give judgments restraining the jurisdiction of other
courts.

The passage I quote from Lord Campbell is in his 2d vol.
Lives of the Chancellors, 184, 185, London edition of 1845,
where, after stating that few of his (Lord Ellesmere's) judg-
ments had come down in a shape to enable us to form an
opinion of their merits, but that they were said to have been
distinguished for sound learning, lucid arrangement, and great
precision of doctrine, he proceeds in the following words:

"The only persons by whom he was not entirely approved
were the common-law judges. He had the boldness to ques-
tion and correct their pedantic rules more freely than Lord
Keeper Puckering, Lord Keeper Bacon, or any of his prede-
cessors, had done, and not unfrequently he granted injunctions
against executions on·common-law judgments, on the ground
of fraud in the plaintiff, or some defect of procedure by which
justice had been defeated. He thus not only hurt the pride
of these venerable magistrates, but he interfered with their
profits, which depended mainly upon the number of suits
brought before them, and the reputation of their respective
courts. These jealousies, which begun so soon after his ap-
pointment, went on constantly increasing, till at last, as we
shall see, they produced an explosion which shook Westminster
Hall·to its centre."

·We need nothing further to·show what respect is due to the
opinions of judges actuated by such motives.

The ·legislation of. England, however, in the present age,
when the principles of civil. liberty and enlightened jurispru-·
dence are better understood, shows that the·restrictions upon

the admiralty jurisdiction, imposed by the King's Bench, have been found unsuitable to the wants of a great commercial people, and that the enlargement of that jurisdiction is not regarded, at the present day, as adverse to the march of liberal and free institutions. And the decisions of the King's Bench having been too firmly established, by repeated adjudications, to be removed by judicial authority, Parliament interposed, and by the statute of 3d and 4th Victoria, passed in 1840, restored to the court many of the most important powers in civil cases that had been wrested from it by the decisions in the King's Bench. The courts of common law proved to be far less suited for such controversies. And it is no small evidence of the soundness of the doctrines heretofore upheld by this court, that with the powers restored by Parliament, the English admiralty now exercises nearly the same jurisdiction which this court had previously maintained to be the appropriate and legitimate power of a court of admiralty. A synopsis of the jurisdiction of the English admiralty, as now established, is stated in 1 Kent's Com., 371, 372, in the notes. But it is proper to remark, that in stating in these notes the admiralty jurisdiction as recognised in the United States, I think it is stated too broadly—broader than this court has sanctioned; for, as regards the jurisdiction in policies of insurance, I believe it has never been asserted in any circuit but the first, and certainly has never been brought here for adjudication.

This brief review of the long contest in England, between the Courts of King's Bench and the admiralty, seemed to be necessary, as it shows past doubt that the efforts of the former to take away the jurisdiction of the latter, and to compel the suitors to seek redress in the King's Bench, did not arise from any anxiety to preserve free institutions, and that the charges made against the admiralty, of favoring despotic principles, and usurping powers which did not belong to it, are without foundation. It shows, moreover, that the persevering encroachments of the King's Bench, and its unwarranted construction of the English statutes, were constantly disputed and opposed by enlightened jurists. The contest was carried on to a very late period, with varying decisions, in the Court of King's Bench itself, upon the subject, and no certain and definite line of jurisdiction in admiralty appears to have been fixed and established, even at the period of the American Revolution, and indeed not until the passage of the late act of Parliament.

And if we are to look to England for an example of enlightened policy in the Government, and a system of jurisprudence suited to the wants of a great commercial nation, or a just and impartial administration of the laws by judicial tribunals upon

principles most favorable to civil liberty, I should not look to the reigns of Richard II, or of Henry IV, or Henry VIII, for either. And I should rather expect to find examples worthy of respect and commendation in the England of the present day, in her statute of 3d and 4th of Victoria, in the elevated and enlightened character of its present courts of justice, and in their mutual respect and consideration for the acts and authority of each other, without any display of jealousy or suspicion.

As to the unfavorable tendencies of the admiralty jurisdiction, it is perhaps sufficient to say, that under the Constitution of the United States it has no criminal jurisdiction; nor is the suitor without the protection of a trial by jury, if the legislative body which creates the court and regulates its powers think proper to give the right. There is nothing in the character and proceedings of the admiralty incompatible with the trial by jury. And, indeed, it has already been given to a certain extent by the act of Congress of 1845, and may at the will of Congress be given in every case, if it is supposed the purposes of justice require it.

I can, therefore see no ground for jealousy or enmity to the admiralty jurisdiction. It has in it no one quality inconsistent with or unfavorable to free institutions. The simplicity and celerity of its proceedings make a jurisdiction of that kind a necessity in every just and enlightened commercial nation. The delays unavoidably incident to a court of common law, from its rules and modes of proceeding, are equivalent to a denial of justice where the rights of seamen, or maritime contracts or torts, are concerned, and seafaring men the witnesses to prove them; and the public confidence is conclusively proved by the well-known fact, that in the great majority of cases, where there is a choice of jurisdictions, the party seeks his remedy in the court of admiralty in preference to a court of common law of the State, however eminent and distinguished the State tribunals may be.

The opinions of Lord Coke, in all matters relating to the laws and institutions of England, were deeply impressed upon the English nation, and for a long time exercised a controlling influence. But with the advance of knowledge, and a more enlightened judgment in the science of government and jurisprudence, the courts of justice have not shut their eyes to errors committed under the influence of prejudice or passion. This is evident from the language of Mr. Justice Buller hereinbefore mentioned, by the respect shown to the jurisdiction and authority of the admiralty in the case of the Flora, in 1st Hag., and by the recent act of Parliament, and I can see no good

*Taylor et al. v. Carryl.*

reason for fostering in the common-law courts of this country, whether State or Federal, opinions springing from prejudices which arose out of the conflicts of the times, and which tend to create jealousies and suspicions on their part, and produce discord instead of harmony and mutual good feeling in the tribunals of justice. These jealousies and suspicions of Lord Coke undoubtedly grew out of the vehement conflicts, personal as well as political, in which he was so prominently engaged during all his lifetime. They have been discarded and disowned in the courts of the country from which we derived them, and also emphatically repudiated by the stat. of 3 and 4 of Victoria.

And believing, as I do, upon the best consideration I am able to give to the subject, that the decision and the principle upon which the opinion of the court founds itself is inapplicable to the case before us, and that if it is carried out to its legitimate results it will deprive the admiralty of power, useful, and indeed necessary, for the purposes of justice, and conferred on it by the Constitution and laws of the United States, I must respectfully record my dissent.