H. W. DENTON and International Union of Electrical, Radio and Machine Workers, CIO,

v.

CITY OF CARROLLTON, GEORGIA, et al.

No. 15841.

United States Court of Appeals
Fifth Circuit.

July 20, 1956.

Rehearing Denied Sept. 20, 1956.

Cameron, Circuit Judge, dissented.

**482**

Bert Diamond, Washington, D. C., J. R. Goldthwaite, Jr., Atlanta, Ga., Benjamin C. Sigal, Washington, D. C., Adair & Goldthwaite, Atlanta, Ga., for appellants.

Shirley C. Boykin, Carrollton, Ga., W. Glen Harlan, Charles A. Moye, Jr., Atlanta, Ga., H. Lamar Knight, Carrollton, Ga., for appellees.

Before HUTCHESON, Chief Judge, and CAMERON and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

International Union of Electrical, Radio and Machine Workers, CIO, and Denton, a Georgia citizen, one of its employed labor organizers, sought declaratory and injunctive relief against the enforcement of an Ordinance [1] of the City of Carrollton, Georgia, requiring that any person, firm, or corporation engaging in the profession, business enterprise or occupation of labor union agent, promoter, or organizer apply for and obtain a license for which the license fee was $1,000.00 plus $100.00 for each day the activity was carried on. Conviction for failure to comply with the Ordinance subjected a violator to a fine not exceeding $100.00 or imprisonment not exceeding sixty days or both.

The plaintiffs claimed, and the Court found, that at least some of the em-

---

1. "An Ordinance providing for a business license tax and per diem license for any person conducting the business or occupation of labor union, union agent or labor union promotor or labor union organizer * * *.

"* * * that * * * any person, firm or corporation who engaged in, or who may exercise for any length of time within the City of Carrollton the profession, business enterprise or occupation in the capacity of a labor union agent, labor union promotor, labor union organizer, shall prior to engaging to any extent in any said activities file written application with the Mayor and City Council of the City of Carrollton, giving the name of such individual, firm or corporation seeking said license, the age, place of origin, the employer, if any, of said person, the criminal record, if any, of said person and if none so stating upon oath, and such other matters as the Mayor and Council shall require, and no such license shall be approved except by act of the Mayor and Council.

"Upon approval of the Mayor and Council of any such application the applicant shall pay a license tax in the amount of $1,000.00 and shall thereafter deposit at the beginning of each twenty four hour period of each day for each person engaged in any said activity the sum of $100.00 with the City Clerk for the continuance of said license during said twenty four hour period. There shall be no proration of the initial license of $1,000.00.

"* * * that any individual firm or corporation failing to obtain the aforesaid license or to thereafter pay the per diem continuation tax herein provided and set out, shall upon conviction be punished as prescribed in Section 263 of the Code of the City of Carrollton, Georgia."

ployees of two manufacturing concerns in Carrollton engaged in interstate commerce had sought assistance in organizing the employees of these plants as members of the IUE who would then act as Collective Bargaining Agent for them. To do this effectively required that an organizer (Denton) "talk to, contact, assemble and meet with" these employees within the city limits of Carrollton and which would be, "activities covered by the Ordinance." Accepting, apparently, the plaintiffs' further proof that on inquiry by Denton whether this Ordinance would be enforced if he undertook to do this organizational work, the city officials stated that all Ordinances would be enforced, the Court held further that there would be, "a probable institution of criminal proceedings against * * * Denton, if * * * [he] should * * * proceed with organizational efforts without obtaining a license * *."

In addition to the attack that the Ordinance was an unconstitutional deprivation of the right of free speech, public assembly, and dissemination of lawful information, Thomas v. Collins, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430; cf. Grosjean v. American Press Co., 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660; Hague v. CIO, 307 U.S. 496, 59 S.Ct. 954, 83 L. Ed. 1423; Lovell v. City of Griffin, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949; Largent v. State of Texas, 318 U.S. 418, 63 S.Ct. 667, 87 L.Ed. 873; Martin v. City of Struthers, Ohio, 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313; and an unwarranted discrimination against labor unions as a class and field of local regulation in violation of the due process and equal protection provisions of the Constitution, e.g., Truax v. Raich, 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131; cf. Hale v. Bimco Trading Co., 306 U.S. 375, 59 S.Ct. 526, 83 L.Ed. 771; the Ordinance was primarily assailed as an unconstitutional interference with the operation of the Labor Management Relations Act, 29 U.S.C.A. § 141 et seq. carrying forward the policy of the predecessor National Labor Relations Act; see Amalgamated Utility Workers v. Consolidated Edison Co., 309 U.S. 261, 267, 60 S.Ct. 561, 84 L.Ed. 738; Amalgamated Ass'n, etc. v. Wisconsin Employment Relations Board, 340 U.S. 383, 398, 71 S.Ct. 359, 95 L.Ed. 364; Garner v. Teamsters, etc., 346 U.S. 485, 490, 74 S.Ct. 161, 98 L.Ed. 228.

In elaboration of this point, they asserted that the operation of the Ordinance brought it within each of the three classes of forbidden local regulations delineated in Weber v. Anheuser-Busch, Inc., 348 U.S. 468, 75 S.Ct. 480, 485, 99 L.Ed. 546: *First*, it prohibits the exercise of the right of " 'full freedom' of workers in the selection of bargaining representatives of their own choice," Hill v. State of Florida, 325 U.S. 538, 65 S.Ct. 1373, 1374, 89 L.Ed. 1782; International Union of United Automobile, Aircraft and Agricultural Implement Workers of America v. O'Brien, 339 U. S. 454, 70 S.Ct. 781, 94 L.Ed. 978; Amalgamated Ass'n, etc. v. Wisconsin Employment Relations Board, supra; Garner v. Teamsters, etc., supra, since employees, while presumably free to choose representatives under Section 7 of the Act must confine their choices to agents approved and licensed by the local City Government; *Second*, it tends to regulate, by establishing its own standards, conduct which has been prohibited as an "unfair labor practice" under the Act, Plankinton Packing Co. v. Wisconsin Employment Relations Board, 338 U. S. 953, 70 S.Ct. 491, 94 L.Ed. 588; Building Trades Council v. Kinard Construction Co., 346 U.S. 933, 74 S.Ct. 373, 98 L.Ed. 423; Garner v. Teamsters, etc., supra; Capital Service v. N. L. R. B., 347 U.S. 501, 74 S.Ct. 699, 98 L.Ed. 887; e.g., the duty to bargain in good faith with employees' representative would, or might, depend on whether the "person * * * who engaged in * * * the profession, business enterprise or occupation * * * of a * * * union agent" was properly licensed; cf. 29 U.S. C.A. §§ 158(b), 159(f–h), 160(c) and United Mine Workers of America v. Arkansas Oak Flooring Co., 351 U.S. 62, 76 S.Ct. 559; *Third*, it infringes upon the machinery for dealing with certifica-

tion which carries "implications of exclusiveness", LaCrosse Telephone Corp. v. Wisconsin Employment Relations Board, 336 U.S. 18, 69 S.Ct. 379, 93 L. Ed. 463; Bethlehem Steel v. New York State Labor Relations Board, 330 U.S. 767, 67 S.Ct. 1026, 91 L.Ed. 1234, since the payment of an exorbitant fee is a prerequisite to soliciting or procuring a sufficient "showing of interest" of at least 30% of the employees in the unit claimed, 29 U.S.C.A. § 159(c), NLRB Statement of Procedure, Sections 101.16–101.17.

 But the District Court never got that far. To be sure, he found jurisdiction, 28 U.S.C.A. § 1343, and rightly so since, on the merits, although he did not find it necessary to decide this ground, there was a serious and substantial question, 28 U.S.C.A. § 1337,[2] whether the Ordinance collided with pre-emptive Congressional legislation such as the National Labor Relations Act, 29 U.S.C.A. § 141 et seq., A.F.L. v. Watson, 327 U.S. 582, 66 S.Ct. 761, 90 L.Ed. 873.[3] He declined to exercise the jurisdiction he possessed for a twofold reason. First, because to do so would be to stay proceedings in a state court contrary to the Statute.[4] Second, and this was the principal basis for his action, the case was wanting in equity for lack of a showing of danger of irreparable injury, both great and immediate, under the general principles restated [5] in Douglas v. City of Jeannette, 319 U.S. 157, 163, 164, 63 S.Ct. 877, 881, 87 L.Ed. 1324.

2. 28 U.S.C.A. § 1337: "The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies."

3. Jurisdiction was also asserted under 28 U.S.C.A. § 1331: "The district court shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $3,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States." The Court stated that jurisdiction was not predicated upon such allegations although, on this uncontradicted record, since the validity of the license fees was also brought directly in question, the payment of the initial fee and the probable liability for the daily fee for 21 days would, without more, satisfy this requirement.

4. 28 U.S.C.A. § 2283: "A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." The District Court relied strongly on Amalgamated Clothing Workers of America v. Richman Brothers, 348 U.S. 511, 75 S.Ct. 452, 99 L.Ed. 600.

5. "Congress, by its legislation, has adopted the policy, with certain well defined statutory exceptions, of leaving generally to the state courts the trial of criminal cases arising under state laws, subject to review by this Court of any federal questions involved. Hence, courts of equity in the exercise of their discretionary powers should conform to this policy by refusing to interfere with or embarrass threatened proceeding in state courts save in those exceptional cases which call for the interposition of a court of equity to prevent irreparable injury which is clear and imminent; and equitable remedies infringing this independence of the states—though they might otherwise be given—should be withheld if sought on slight or inconsequential grounds. * * *

"It is a familiar rule that courts of equity do not ordinarily restrain criminal prosecutions. No person is immune from prosecution in good faith for his alleged criminal acts. Its imminence, even though alleged to be in violation of constitutional guaranties, is not a ground for equity relief since the lawfulness or constitutionality of the statute or ordinance on which the prosecution is based may be determined as readily in the criminal case as in a suit for an injunction. Davis & F. Mfg. Co. v. City of Los Angeles, 189 U.S. 207, 23 S.Ct. 498, 47 L.Ed. 778; Fenner v. Boykin, 271 U.S. 240, 46 S.Ct. 492, 70 L.Ed. 927. Where the threatened prosecution is by state officers for alleged violations of a state law, the state courts are the final arbiters of its meaning and application, subject only to review by this Court on federal grounds appropriately asserted. Hence the arrest by the federal courts of the processes of the criminal law within the states, and the determination of questions of criminal liability under state law by a federal court of equity, are to be supported only on a showing of danger of irreparable injury

But this wholesome rule envisages itself the necessity, under circumstances of genuine and irretrievable damage, for affording equitable relief even though the result is to forbid criminal prosecution or other legal proceedings. We start here with an exaction euphemistically called a "license tax," but which in its cumulative effect is exorbitant and punitive. Its effect, and therefore its purpose, seems not to regulate, but to prohibit. The payment of a license tax of $1,000.00 while large, would not alone, even if legality were doubtful, present a case for equitable relief. But to this must be added the further sum of $100.00 for each day a person acts not only as a "labor union organizer," but as "union agent" as well, which could presumably cover activities long after the organization drive and while the union, victorious in the membership campaign, undertakes what may be a protracted process of bargaining. For one person for one year of working days, the total would approach $32,300.00.

■■ To require the payment of any such sum as a condition to testing the validity of the exaction, if it does not of itself make the tax illegal for that reason, at least presents such a heavy burden that to decline equitable relief would be to deny judicial review altogether, Ex parte Young, 209 U.S. 123, 144, 28 S.Ct. 441, 52 L.Ed. 714, 722; Missouri Pacific Ry. Co. v. Tucker, 230 U.S. 340, 33 S.Ct. 961, 57 L.Ed. 1507; Terrace v. Thompson, 263 U.S. 197, 44 S.Ct. 15, 68 L.Ed. 255; Beal v. Missouri Pacific R. Co., 312 U.S. 45, 61 S.Ct. 418, 85 L.Ed. 577. Indeed, in such a setting, where the so-called tax has clearly punitive qualities, it may, if invalid, be enjoined, Regal Drug Co. v. Wardell, 260 U.S. 386,

43 S.Ct. 152, 67 L.Ed. 318; United States v. LaFranca, 282 U.S. 568, 51 S.Ct. 278, 75 L.Ed. 551; Raymond v. Chicago Union Traction Co., 207 U.S. 20, 28 S.Ct. 7, 52 L.Ed. 78; Union Pacific R. Co. v. Board of Commissioners of Weld County, 247 U.S. 282, 38 S.Ct. 510, 62 L.Ed. 1110; Lee v. Bickell, 292 U.S. 415, 54 S.Ct. 727, 78 L.Ed. 1337; and see Allen v. Regents of University of Georgia, 304 U.S. 439, 58 S.Ct. 980, 82 L.Ed. 1448; Miller v. Standard Nut Margarine Co., 284 U.S. 498, 52 S.Ct. 260, 76 L.Ed. 422; Georgia Railroad & Banking Co. v. Redwine, 342 U.S. 299, 72 S.Ct. 321, 96 L.Ed. 335; Toomer v. Witsell, 334 U.S. 385, 68 S.Ct. 1156, 92 L.Ed. 1460.

■■ The large amount of money required to pre-pay for a test becomes an aggravated factor if actual doubt exists concerning the recoverability of such sums in the event the basic law is ultimately declared invalid. That doubt both eliminates the statutory [6] prohibition against enjoining state tax collections and is a basis for apprehension of genuine and irretrievable loss. Union Pacific R. Co. v. Board of Com'rs of Weld County, supra; Raymond v. Chicago Union Traction Co., supra; Georgia Railroad & Banking Co. v. Redwine, supra; Fox v. Standard Oil Co., 294 U.S. 87, 55 S.Ct. 333, 79 L.Ed. 780; Graves v. Texas Co., 298 U.S. 393, 56 S.Ct. 818, 80 L.Ed. 1236; Dawson v. Kentucky Distilleries & Warehouse Co., 255 U.S. 288, 41 S.Ct. 272, 65 L.Ed. 638; Atlantic Coast Line R. Co. v. Doughton, 262 U.S. 413, 43 S.Ct. 620, 67 L.Ed. 1051. This is of critical importance here for, considering that any such suits for recovery would likely be in Georgia State Courts over whom we would have no corrective powers, the most that a Federal Court

---

'both great and immediate'. Spielman Motor Sales Co. v. Dodge, 295 U.S. 89, 95, 55 S.Ct. 678, 680, 79 L.Ed. 1322, 1325, and cases cited; Beal v. Missouri P. R. Corp., 312 U.S. 45, 49, 61 S.Ct. 418, 420, 85 L.Ed. 577, 579, and cases cited; Watson v. Buck, 313 U.S. 387, 61 S.Ct. 962, 85 L.Ed. 1416 [136 A.L.R. 1426]; Williams v. Miller, 317 U.S. 599, 63 S.Ct. 258, 87 L.Ed. 489."

See also Galfas v. City of Atlanta, 5 Cir., 193 F.2d 931; City of Miami v. Sutton, 5 Cir., 181 F.2d 644.

6. 28 U.S.C.A. § 1341: "The district court shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State."

could say is that the right of recovery under Georgia law is doubtful,[7] at least. That is all that is required, Dawson v. Kentucky Distilleries & Warehouse Co., 255 U.S. 288, 296, 41 S.Ct. 272, 275, 65 L.Ed. 638, 646, "The decisions of the highest court of the state left it at least doubtful whether money so paid could have been recovered at law by the taxpayer, among other reasons, because the money would not have been paid under compulsion of distraint or of a right of distraint or under a mistake of law or of fact * * *. It is well settled that 'if the remedy at law be doubtful, a court of equity will not decline cognizance of the suit.' Davis v. Wakelee, 156 U.S. 680, 688, 15 S.Ct. 555, 558 (39 L.Ed. 578, [584]). * * *"

Of course, since we hold that the successive license tax was itself so large and the uncertainties about its recovery so great that plaintiffs were not required to pay them as the means of testing the substantial questions over this Ordinance, it is equally true that, under such circumstances, they did not have to run the further serious risk of substantial fines and extended imprisonment for new and successive offenses were they to carry on the activities without license or payment of tax. This combination of circumstances made the threat of real and lasting damage genuine and present.

7. Recoverability depends entirely upon compliance with and interpretation of the Georgia Code, State Revenue Commission v. Alexander, 1936, 54 Ga.App. 295, 187 S.E. 707, 708, "* * * 'At common law, and for many years under the federal statutes, protest at the time of payment was a condition precedent to the recovery of a tax.' * * * under our state statutes, however, a stricter rule is imposed, and a mere protest will not suffice to change the status from that of a voluntary payment * * *. There is no general statute in Georgia affording a taxpayer a remedy for the recovery of taxes illegally or erroneously assessed, except as is hereinbefore quoted [referring to Code of Georgia, 1933, § 20–1007]."

Code of Georgia, 1933, § 20–1007 (4317): "Voluntary payments; recovery back.—Payments of taxes or other claims, made through ignorance of the law, or where the facts are all known, and there is no misplaced confidence and no artifice, deception, or fraudulent practice used by the other party, are deemed voluntary, and cannot be recovered back, unless made under an urgent and immediate necessity therefor, or to release person or property from detention, or to prevent an immediate seizure of person or property. Filing a protest at the time of payment does not change the rule."

Hoke v. City of Atlanta, 1899, 107 Ga. 416, 33 S.E. 412, denied recovery for taxes paid under protest and threat of levy of execution. Dennison Mfg. Co. v. Wright, 1923, 156 Ga. 789, 120 S.E. 120, apparently indicated a right to recover protest payments made under threat of criminal proceedings; but Strachan Shipping Co. v. City of Savannah, 1929, 168 Ga. 309, 147 S.E. 555, creates much doubt since a petition alleging payment of an unlawful tax by reason of the *fear* of criminal prosecution was held insufficient. Eibel v. Royal Indemnity Co., 1934, 50 Ga.App. 206, 177 S.E. 350, denied recovery of tax paid under threat of warrant of arrest from an officer having no authority to issue it; see New York Life Insurance Co. v. Williamson, 1936, 53 Ga.App. 28, 184 S.E. 755. In Goodwin v. MacNeill, 1939, 188 Ga. 182, 3 S.E. 2d 675, the Georgia Supreme Court denied recovery of a fine paid to avoid imprisonment under a sentence of conviction which, on appeal, was reversed.

Georgia Railroad & Banking Co. v. Redwine, 342 U.S. 299, 72 S.Ct. 321, 323, 96 L.Ed. 335, augments the *doubt* when a municipality is involved for, to the Georgia Attorney General's claim of a " 'plain, speedy and efficient' " remedy by "(3) suing the State for refund after payment of taxes" the Court said, "* * * The third remedy, suit for refund after payment, is applicable only to taxes payable directly to the State and amounting to less than 15% of the total taxes in controversy * * *."

Whatever the ultimate Georgia holding, the right is at least uncertain, perhaps affected by the circumstances in which the payment is made from "fear" rather than "threat" of prosecution, and may here expose the payer to risk of financial irresponsibility of the individual City Clerk as tax collector of this small (population 7,753) city, since the liability for repayment is apparently personal and not official, Dennison Mfg. Co. v. Wright, supra, a factor of possible dominant importance since right of recovery requires actual collectibility in money, Stewart Dry Goods Co. v. Lewis, 287 U.S. 9, 53 S.Ct. 68, 77 L.Ed. 135.

There was, therefore, a substantial basis for equitable relief, A. F. L. v. Watson, supra; Hynes v. Grimes Packing Co., 337 U.S. 86, 69 S.Ct. 968, 93 L.Ed. 1231; Shields v. Utah Idaho Central Railroad Co., 305 U.S. 177, 59 S.Ct. 160, 83 L.Ed. 111; Traux v. Raich, supra; Toomer v. Witsell, supra.

The District Court should have exercised its jurisdiction and considered and determined the merits of the case and the validity or unconstitutionality of the Ordinance. The case is therefore reversed and remanded [8] for further and not inconsistent proceedings.

Reversed and remanded.

CAMERON, Circuit Judge (dissenting).

I.

My inability to go along with the majority would be evidenced only by noting a dissent if I could conclude that this case is an isolated episode. But what is here done seems to be but another step in a series of decisions in this Circuit demonstrating a dangerous tendency to exalt the federal judiciary and debase the states in their efforts at performance of their legitimate and important function of local self-government.

II.

(1) The question here involved is a simple one: Whether the State of Georgia, through one of its municipalities, may enforce its criminal laws without interference on the part of the federal courts. The Court below accurately set forth the facts framing the issue in its statement: [1]

"* * * a labor union organizer for the International Union of Electrical, Radio and Machine Workers, CIO of Washington, D. C., brought this action against the City of Carrollton, Georgia * * * seeking to enjoin defendants from instituting or prosecuting criminal proceedings against him in the event petitioner in the future should violate a certain ordinance by the City Council, which he contends to be invalid and unconstitutional."

The answer is equally simple and is furnished by the explicit language of the Federal Statute: [2]

"*Stay of state court proceedings. A court of the United States may not grant an injunction to stay proceedings in a State court* except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." [Emphasis added.]

Since no one contends that this case is covered by any of the exceptions contained in the Act, only the italicized portion should be considered. So read, there is a clear and categorical provision that a federal court "may not grant an injunction to stay proceedings in a state court." It would seem unnecessary to go further. But the majority here does not follow that unequivocal language, but creates an exception which the statute does not permit, and its history and the court decisions under it specifically condemn.

(2) "By that enactment [the revision and codification of 1948], Congress made clear beyond cavil that the prohibition is not to be whittled away by judicial improvisation. * * * In lieu of the bankruptcy exception of § 265 [the predecessor of 2283], Congress substituted a generalized phrase covering alll exceptions * * * to be found in federal statutes. * * * In any event, Congress has left no justification for its recognition now. This is not a statute conveying a broad general policy for appro-

---

8. The case is reversed as to both Denton and IUE. The Court on remand may have to determine whether the Ordinance applies to the Union as such or would entitle it, as distinguished from an individual employee of these local concerns, to relief. The caption, concepts of principal-

agent reflected in the Ordinance and affidavits of city officials might indicate affirmative answers. But, as on the merits generally, we express no opinion on this.

1. Denton v. City of Carrollton, Ga., D.C., 132 F.Supp. 302–303.

2. 28 U.S.C.A. § 2283.

priate *ad hoc* application. Legislative policy is here expressed in a clear-cut prohibition qualified only by specifically defined exceptions. * * *"

So spoke the Supreme Court, giving the last word on the subject in Amalgamated Clothing Workers of America v. Richman Bros. Co.[3] The Court stated further: "We need not re-examine the series of decisions, prior to the enactment of Title 28 of the United States Code in 1948, *which appeared to recognize implied exceptions to the historic prohibition against federal interference with state judicial proceedings.* See Toucey v. New York Life Insurance Co., 314 U.S. 118, 62 S.Ct. 139, 86 L.Ed. 100." [Emphasis added.] Yet the majority here does carve out an exception "by judicially improvisation" based—if there is any supporting authority—solely upon "the series of decisions" thus rejected.

The broad sweep of the Richman decision in ascribing to § 2283 aspects of complete prohibition can be understood by considering, in connection with it, the Toucey case, supra, and Weber v. Anheuser-Busch, Inc.,[4] discussed by the Supreme Court in Richman. In Anheuser-Busch, decided a week before Richman, the employer had obtained from a state court of Missouri preliminary and permanent injunctions against striking employees. The Supreme Court of Missouri had affirmed[5] and the Supreme Court granted certiorari.[6] The decisions of the Missouri Courts were reversed on the ground that the state court had no jurisdiction to grant the injunction because Congress had conferred exclusive jurisdiction in the National Labor Relations Board.

The identical fact situation—to Anheuser-Busch was involved in Richman, the company having brought suit in the Court of Common Pleas in Ohio to enjoin the Union from picketing its factories and stores. The Union, however, instituted its action in the District Court of the United States seeking to enjoin the prosecution of the state court suit. But that Court denied the Union's motion for injunction on the ground that it had no jurisdiction under § 2283. The Court of Appeals for the Sixth Circuit affirmed,[7] and the Supreme Court granted certiorari.[8] It opened its opinion in Richman with these words:

"In Weber v. Anheuser-Busch, Inc., 348 U.S. 468, 75 S.Ct. 480 [99 L.Ed. 546], decided last Monday on writ of certiorari to the Missouri Supreme Court, we considered the jurisdiction of a *state court* to enjoin conduct which in one aspect brought it within exclusive federal authority under the Taft-Hartley Act and in another constituted a violation of a state statute against restraint of trade. In this case we have to decide the question whether, under similar circumstances, a union has open to it, *without resorting to the appellate procedures of the State and eventually of this Court, jurisdiction of a federal district court to enjoin the employer from pursuing his action in the state court.*" [Emphasis added.]

Recognizing that a state court suit would indubitably result in an eventual holding that the state was without jurisdiction [it having so held in Anheuser-Busch], the Supreme Court proceeded nevertheless, in Richman, to hold categorically that Congress had robbed federal courts of jurisdiction to enjoin state court proceedings, however palpable the forecast of the result of the state court suit might be. "Under the decision in Weber v. Anheuser-Busch, Inc., we may

---

3. 1955, 348 U.S. 511, 75 S.Ct. 452, 454, 99 L.Ed. 600. The quotation is a composite of disconnected expressions taken from pages 514, 515 and 516 of 348 U.S., pages 454, 455 of 75 S.Ct.

4. 1955, 348 U.S. 468, 75 S.Ct. 480, 99 L.Ed. 546.

5. 364 Mo. 573, 265 S.W.2d 325.

6. 348 U.S. 808, 75 S.Ct. 32, 99 L.Ed. 638.

7. 1954, 211 F.2d 449.

8. 348 U.S. 813, 75 S.Ct. 43, 99 L.Ed. 641.

assume that the conduct in controversy * * * is outside state authority. The question is whether a federal court *may * * * enjoin the attempt to secure relief through state proceedings.*" [Emphasis added.]

In giving a negative answer to that question, the Supreme Court speculated that Congress intended, in its revision of former § 265 of the Judicial Code by the enactment of § 2283, to put in statutory form the teachings of Toucey, supra, wherein the Supreme Court had discussed the court-improvised exceptions at length and had indicated that those exceptions should be brought within severe limitations.[9]

(3) Even without these authorities, which seem to me conclusive of the question before us, it is difficult for me to perceive why the majority would be tempted to intervene here in the light of the Supreme Court's general attitude in recent years towards federal interference with state criminal prosecutions. We are faced here with a simple ordi-

nance carrying moderate penalties of a fine of $100.00 or sixty days' imprisonment or both for its violation,—being the same penalty prescribed for violation of all of the city's ordinances. Denton and his union claimed that the ordinance violated the Fourteenth Amendment to the Constitution.[10] But we ought not to reach that question here. The important point before us involves collision between state and federal courts, and can be, and ought to be, decided on that question of procedure alone.

Certainly the ordinance here involved is not as cleary open to constitutional attack as that considered by the Supreme Court in Douglas v. City of Jeannette, 1943, 319 U.S. 157, 63 S.Ct. 877, 87 L. Ed. 1324. What was there done by the Supreme Court furnishes an exact pattern for what the Court below did in this case and a direct condemnation of what the majority does by its opinion.

The little City of Jeannette, Pennsylvania, had an ordinance requiring a person engaged in solicitation within its

9. The following quotation is made up of separated paragraphs from the Toucey decision at pages 132, 140 and 141 of 314 U.S., at page 143 of 62 S.Ct.:

"Regardless of the various influences which shaped the enactment of § 5 of the Act of March 2, 1793, [the predecessor of § 2283] the purpose and direction underlying the provision is manifest from its terms: *proceedings in the state courts should be free from interference by federal injunction. The provision expresses on its face the duty of 'hands off' by the federal courts in the use of the injunction to stay litigation in a state court. * * *

"We are not dealing here with a settled course of decisions, erroneous in origin but around which substantial interests have clustered. *Only a few recent and episodic utterances furnish a tenuous basis for the exception which we are now asked explicitly to sanction.* Whatever justification there may be for turning past error into law when reasonable expectations would thereby be defeated, no such justification can be urged on behalf of a procedural doctrine in the distribution of judicial power between federal and state courts. * * *

"Section 265 is not an isolated instance of withholding from the federal courts

equity powers possessed by Anglo-American courts. As part of the delicate adjustments required by our federalism, *Congress has rigorously controlled the 'inferior courts' in their relation to the courts of the states.* * * * The guiding consideration in the enforcement of the Congressional policy was expressed by Mr. Justice Campbell, for the Court, in Taylor v. Carryl, 20 How. 583, 597, 15 L.Ed. 1028: 'The legislation of Congress, in organizing the judicial powers of the United States, exhibits much circumspection in avoiding occasions for placing the tribunals of the States and of the Union in any collision.' We must be scrupulous in our regard for the limits within which Congress has confined the authority of the courts of its own creation." [Emphasis supplied.]

10. The majority permits itself, wrongfully, in my opinion, to be drawn into a consideration of the merits of this argument. It seems to me, moreover, that the argument set forth in the majority opinion is not very convincing because the license fees are recoverable under Georgia law, which fact, under Toomer v. Witsell, infra, removes the rigor of the license fees as a consideration which should be weighed in determining the wisdom of equity intervention.

borders to procure a license before beginning such an activity. Failure to procure the license carried a moderate fine, accompanied by imprisonment if the fine were not paid. A group of Jehovah's Witnesses found compliance with that ordinance inconsistent with the tenets of their religion and refused to observe it. Upon being importuned by the city officials to refrain from approaching the residents of the city, they decided upon a mass infiltration of the city and brought one hundred Witnesses into its confines to solicit in defiance of the ordinance. The police force was unable to cope with the situation and the fire department was called out. Twenty-one were arrested and some convicted in the state courts for violation of the ordinance, which convictions were affirmed by the State Appellate Court.[11] The Supreme Court granted certiorari to the Pennsylvania Superior Court[12] and promptly reversed the convictions[13] holding that the city ordinance violated the First Amendment of the United States Constitution.

After these initial convictions some of the Witnesses brought an action in the United States District Court to restrain the enforcement of the ordinance[14] which resulted in the entry of orders enjoining its enforcement. The Court of Appeals for the Third Circuit reversed[15] and the Supreme Court granted certiorari[16] and affirmed the action of the Court of Appeals[17] on the ground that "we find no ground for supposing that the intervention of a federal court, in order to secure petitioners' constitutional rights, will be either necessary or appropriate." Here is some of the Court's language, 319 U.S. at pages 163–164, 63 S.Ct. at page 880:

*"The power reserved to the states under the Constitution to provide for the determination of controversies in their courts may be restricted by federal district courts only in obedience to Congressional legislation in conformity to the Judiciary Article of the Constitution.* Congress, by its legislation, has adopted the policy, with certain well defined statutory exceptions, of leaving generally to the state courts the trial of criminal cases arising under state laws, subject to review by this Court of any federal questions involved. * * *

"No person is immune from prosecution in good faith for his alleged criminal acts. *Its imminence, even though alleged to be in violation of constitutional guaranties, is not a ground for equity relief since the* lawfulness or constitutionality of the statute or ordinance on which the prosecution is based *may be determined as readily in the criminal case as in a suit for an injunction.* * * * Where the threatened prosecution is by state officers for alleged violations of a state law, the state courts are the final arbiters of its meaning and application, subject only to review by this Court on federal grounds appropriately asserted. Hence the arrest by the federal courts of the processes of the criminal law within the states, and the determination of questions of criminal liability under state law by a federal court of equity, are to be supported only on a showing of danger of irreparable injury 'both great and immediate.' * * *

11. 149 Pa.Super. 175, 27 A.2d 666.

12. 318 U.S. 748, 63 S.Ct. 660, 87 L.Ed. 1125.

13. Murdock v. Commonwealth of Pennsylvania, 1943, 319 U.S. 105, 63 S.Ct. 891, 87 L.Ed. 1292.

14. Douglas v. City of Jeannette, D.C.W.D. Pa.1941, 39 F.Supp. 32, and cf. Reid v.

Borough of Brookville, Pa., D.C.W.D. Pa.1941, 39 F.Supp. 30.

15. 1942, 130 F.2d 652.

16. 318 U.S. 749, 63 S.Ct. 660, 87 L.Ed. 1125.

17. Douglas v. City of Jeannette, 1943, 319 U.S. 157, 63 S.Ct. 877, 882, 87 L.Ed. 1324.

"It does not appear from the record *that petitioners have been threatened with any injury other than that incidental to every criminal proceeding* brought lawfully and in good faith, or that a federal court of equity by withdrawing the determination of guilt from the state courts could rightly afford petitioners any protection which they could not secure by prompt trial and appeal pursued to this Court." [Emphasis supplied.]

Citing the Jeannette case, the Supreme Court later reversed the judgment of a District Court in Wisconsin granting injunction against a state court proceeding,[18] although it struck down as unconstitutional the Wisconsin statute involved, by granting certiorari to review a decision of the Supreme Court of Wisconsin upholding the same statute.[19]

Jeannette was further called upon by the Supreme Court to support its action in affirming a decision of the Court of Appeals for the Third Circuit [20] denying the right of a federal court to intervene in state criminal proceedings to prevent what was alleged to be manifest injustice. Stefanelli v. Minard, 1951, 342 U.S. 117, 72 S.Ct. 118, 96 L.Ed. 138. The language used, 342 U.S. at pages 122–125, 72 S.Ct. at page 121, further illuminates the transcendent desire of the federal judiciary to avoid trespassing upon the rights of state courts: "If these considerations limit federal courts in restraining State prosecutions merely threatened, how much more cogent are they to prevent federal interference with proceedings once begun. * * * The consequences of exercising the equitable power here invoked are not the concern of a merely doctrinaire alertness to protect the proper sphere of the States in enforcing their criminal law. * * *

"Mr. Justice Holmes dealt with this problem in a situation especially appealing: 'The relation of the United States and the Courts of the United States to the States and the Courts of the States is a very delicate matter that has occupied the thoughts of statesmen and judges for a hundred years and cannot be disposed of by a summary statement that justice requires me to cut red tape and to intervene.' "

This phase of the discussion may well be concluded by a further draft upon the language of Richman:

"The temporary injunction which has been issued is not, under Ohio Law, appealable, and the appellate procedures which will be available if a permanent injunction is issued are necessarily time-consuming. Thus, so the argument runs, unless the federal court can intervene, delay will not only undercut the legislative scheme, but opportunity for effective union activity may be diminished if not lost.

"The assumption upon which the argument proceeds is that federal rights will not be adequately protected in the state courts, and the 'gap' complained of is impatience with the appellate process if state courts go wrong. But during the more than half of our history Congress, in establishing the jurisdiction of the lower federal courts, in the main relied on the adequacy of the state judicial systems to enforce federal rights, subject to review by this Court. With limited exceptions, it was not until 1875 that the lower federal courts were given general jurisdiction over federal questions. During that entire period, the vindication of federal rights depended upon the procedure which petitioner

18. St. John v. Wisconsin Employment Relations Board, 1951, 340 U.S. 411, 414, 71 S.Ct. 375, 95 L.Ed. 386.

19. Amalgamated Association, etc. v. Wisconsin Employment Relations Board, 340 U.S. 383, 71 S.Ct. 359, 95 L.Ed. 364, re-

versing decision of Wisconsin Supreme Court reported in Wisconsin Employment Relations Board v. Milwaukee Gas Light Co., 258 Wis. 1, 44 N.W.2d 547.

20. 184 F.2d 575.

attacks as so grossly inadequate that it could not have been contemplated by Congress. *The prohibition of § 2283 is but continuing evidence of confidence in the state courts, reenforced by a desire to avoid direct conflicts between state and federal courts.* \* \* \*

"Misapplication of this Court's opinions is not confined to the state courts, nor are delays in litigation peculiar to them. \* \* \* There may also be added an element of federal-state competition and conflict which may be trusted to be exploited and to complicate, not simplify, existing difficulties."[21]

(4) The majority opinion cites a multitude of cases, but an inspection of them will demonstrate that none of them give convincing support to the action taken by it. To begin with, not one of its cases was decided under the revised statute of 1948, and most of the cases are old ones and bear no remote relationship to the attitude of the Supreme Court as exemplified in such cases as Richman and City of Jeannette. For the most part, the cases relied upon went off on other important points and related, if at all, only incidentally to criminal prosecutions.[22]

On the other hand, the cases where injunctions against state criminal prosecutions have been denied are legion.[23]

21. The quotation is taken from 348 U.S. 517-519, 75 S.Ct. at page 456; emphasis is supplied.

22. For example, Georgia R. & B. Co. v. Redwine, 1952, 342 U.S. 299, 72 S.Ct. 321, 323, 96 L.Ed. 335, did not involve a criminal prosecution at all, but arose under the statute covering injunctions against state tax statutes, which withheld the right to injunction only in those cases where the state remedy was "'plain, speedy and efficient.'" Hynes v. Grimes Packing Co., 1949, 337 U.S. 86, 69 S.Ct. 968, 93 L.Ed. 1231, did not involve state action, but was against the Regional Director, Department of the Interior, and involved fishing rights in an Indian reservation situated in Alaska. Toomer v. Witsell, 334 U.S. 385, 68 S.Ct. 1156, 92 L.Ed. 1460, placed the emphasis on other controlling factors besides criminal prosecution. Among these were the right of South Carolina to regulate the fishing industry in adjacent waters, reciprocal rights between the state and the United States in connection with such regulations, the imposition of a license fee against non-residents which was one hundred times that imposed on residents. Even in that case it was held that, where the state statute gave the right to recover back any exactions paid under protest, injunction would not lie.

23. No good purpose will be served by discussing others at any length, but it is worth noting that, in other cases, language equally as strong as that heretofore quoted has been used. For example, in Fenner v. Boykin, 1926, 271 U.S. 240, 244, 46 S.Ct. 492, 493, 70 L.Ed. 927, the Supreme Court said: "An intolerable condition would arise, if, whenever about to be charged with violating a state law, one were permitted freely to contest its validity by an original proceeding on some federal court." And in Massachusetts State Grange v. Benton, 1926, 272 U.S. 525, 527-529, 47 S.Ct. 189, 190, 71 L.Ed. 387, Mr. Justice Holmes used this language: "But it also went on the important rule, which we desire to emphasize, that no injunction ought to issue against officers of a State clothed with authority to enforce the law in question, unless in a case *reasonably free from doubt* and when necessary to prevent great and irreparable injury. \* \* \* upon the merits we think it too plain to need argument that to grant an injunction upon the allegations of this bill would be to *fly in the face of the rule which, as we have said, we think should be very strictly observed.*" And in Alabama Public Service Commission v. Southern Railway Co., 1951, 341 U.S. 341, 349-350, 71 S.Ct. 762, 768, 96 L.Ed. 1002, Mr. Justice Vinson used this language: "Equitable relief may be granted only when the District Court, in its sound discretion exercised with the 'scrupulous regard for the rightful independence of state governments which should at all times actuate the federal courts,' is convinced that the asserted federal right cannot be preserved except by granting the 'extraordinary relief of an injunction in the federal courts.' Considering that 'few public interests have a higher claim upon the discretion of a federal chancellor than the avoidance of needless friction with state policies,' the usual rule of comity must govern

(5) This absolute rule of deferring to state courts has been followed uniformly, until the present case, by this Court. The two decisions establishing the law in this Circuit, City of Miami v. Sutton, 5 Cir., 1950, 181 F.2d 644, and Galfas v. City of Atlanta, 5 Cir., 1952, 193 F.2d 931, cover every phase of the case now before the Court.

Sutton involved an effort by plaintiffs in the United States District Court to enjoin enforcement by the City of Miami of its ordinances covering jewelry auctions, which ordinances were attacked as unconstitutional under the Fourteenth Amendment with the charge that the city officials were threatening to arrest the plaintiffs and all of their employees unless they complied. The trial Court overruled motion to dismiss and granted temporary injunction and, upon appeal by the City, we reversed, ordering the complaint to be dismissed. We quoted copiously from Beal v. Missouri Pacific Railroad Corp., 312 U.S. 45, 61 S.Ct. 418, 85 L.Ed. 577 (probably the strongest of the Supreme Court cases mentioned above) to the effect that intervention to arrest state prosecutions can be justified only in most exceptional circumstances and upon clear showing that injunction is necessary to prevent irreparable injury; holding that " 'in the exercise of the sound discretion, which guides the determination of courts of equity, scrupulous regard must be had for the rightful independence of state governments * * *.' " [181 F.2d 649.]

In reversing the decision of the lower Court, we established principles which govern these facets of the case before us: (1) That an injury relating, not to an established business, but to an activity plaintiffs intended to embark upon, did not demonstrate " 'the imminence and immediacy of proposed enforcement' " such as could be restrained; (2) that the inclusion of a prayer for declaratory relief did not, in anywise, relax "the restrictions upon the propriety of the grant by the federal court of an injunction to restrain the institution of prosecutions for violations of state or municipal penal laws"; and (3) that punishment by fine and imprisonment which was greater than that involved here did not justify equity intervention.

Incidentally, the majority opinion here misses the mark entirely, in my judgment, in dwelling upon the high license fees provided in the ordinance now before the Court. It would have made no difference if Denton and his union had, by its terms, been excluded altogether from their planned activities. It lay within their power and choice to begin the activities covered by the ordinance without paying the license fees, in which event the only risk involved would have been the fine or imprisonment contained in the ordinance. The test lies entirely in the rigor and reasonableness of the terms of punishment.[24] We recently sanctioned injunctive relief against enforcement of an unconstitutional ordinance because it was impossible for the plaintiff to test its constitutionality by violating it for the reason that such violation required the participation of others, which it was admitted could not possibly be obtained.[25] None of these difficulties are present here.

Galfas involved an attack in the Federal Court on a zoning ordinance of the

---

the exercise of equitable jurisdiction by the District Court in this case. Whatever rights appellee may have are to be pursued through the state courts." [Emphasis added in each instance.]

And see Beal v. Missouri Pacific R. Corp., 1940, 312 U.S. 45, 61 S.Ct. 418, 85 L.Ed. 577; Fenner v. Boykin, 1926, 271 U.S. 240, 46 S.Ct. 492, 70 L.Ed. 927; and the Georgia Supreme Court decision, Staub v. Mayor, etc., of Baxley, 1954, 211 Ga. 1, 83 S.E.2d 606.

24. Indeed, in Sutton, while discussing this feature, we quoted the celebrated statement of Mr. Justice Holmes in Nash v. United States, 229 U.S. 373, 377, 33 S.Ct. 780, 57 L.Ed. 1232, to the effect that men had to choose every day whether they would violate penal laws and suffer the consequences involved even though death might be one of those consequences.

25. City of Houston v. James K. Dobbs Co. of Dallas, Inc., 5 Cir., 232 F.2d 428.

City of Atlanta by the title owner of a certain property and a group of Jehovah's Witnesses who desired to erect and maintain churches or meeting halls on the several pieces of property. They pitched their complaint upon alleged denial of right to equal protection of the laws, to freedom of assembly and worship, freedom of speech, and upon a violation of the Civil Rights statutes.[26] Galfas was confronted with threatened criminal prosecution and the other plaintiffs would be subjected to humiliation, disgrace, loss of good will, and opportunity to worship unless relief were given.

The trial Court denied the injunction and we affirmed, using in part this language [193 F.2d 934]:

"The determination [of whether an injunction should issue] involved consideration of the 'doctrine of abstention appropriate to our federal system whereby the federal courts, "exercising a wise discretion," restrain their authority because of "scrupulous regard for the rightful independence of the state governments" and for the smooth working of the federal judiciary.' * * * Appropriate to this was the nature and immediacy of the claimed irreparable injury, the existence of which is essential to justify such restraint, and the established policy *which chooses State Courts as the preferable forum for adjudication of the question whether local statutes offend the Federal Constitution, since these courts, equally with the federal courts, are charged with the duty of safeguarding constitutional rights,* and, under our dual system of government, have the authoritative say on the construction and meaning of state statutes." [Emphasis added.]

We reiterated that declaratory relief was not justification for relaxation of the general rule, and held that the fact that the city authorities had threatened pros-

ecution and that the civil rights of plaintiffs would be jeopardized without injunction were not sufficient to warrant intervention by the federal courts. There is no feature presented here which was not decided in the Sutton and Galfas cases, and each of those cases presented a stronger claim for intervention than the present one.

In obedience to the principles established in these cases and those from the Supreme Court above discussed, the Court below in the present case dismissed the complaint and denied the injunctive relief sought. To put the Court in error in thus using its discretion can, therefore, be construed in no other way than as saying that we have changed our minds as to the principles involved and will not follow the cases heretofore decided and standing, until now, without any challenge or modification.

### III.

(1) "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

These words of the Tenth Amendment should, in my opinion, be kept constantly before every person holding a commission from the federal government. This Amendment has, through the years, been considered the axis upon which our entire constitutional system revolves; the heart which gives sustenance and vitality to the whole organism; the balance wheel whose steady functioning insures the smooth working of the entire mechanism.

Such a course would be calculated to dispel the idea too often lurking in the shadows that federal functionaries are endowed with some sort of superior wisdom and virtue; and would nourish the notion that federal and state officials are equals in the privilege of proving themselves consecrated servants, working for the common welfare.

26. Specified as 8 U.S.C.A. §§ 41, 42, 43, 47 and 49.

A true sense of proportion requires that we keep in mind that the States of the Union existed prior to the adoption of the Federal Constitution and were possessed of all the attributes of sovereignty and have retained all of these attributes except those surrendered in the Constitution to the federal government, not by the people of America but by the people of the several states; that the States have the right to order their own affairs and govern their own people and are supreme in all spheres and areas except those thus committed to the federal government. It is vital also that we should be ever aware that the police power is an attribute of sovereignty, and is possessed by the States by natural endowment and not by grant of any written Constitution, and that the general police powers within the territorial limits of the States do not belong to the federal government; and that the federal courts (except the Supreme Court) have only such jurisdiction as Congress has conferred upon them.

It is openly and generally stated that these principles have been lost sight of in recent years, or have been definitely weakened by attrition. Thoughtful people have been and are deeply concerned over this loss of perspective and most everybody feels that something should be done about it,—that is, most everybody except the judges. There is to me an extremely disquieting tendency to debase the States, their powers and their courts, manifested in a series of decisions in this Circuit, to which the present one belongs.

(2) Illustrative of this tendency is the handling given in recent years to cases in which attacks have been made upon the constitutionality of State statutes. Out of deference to the dignity of the States and an abundance of caution that their functioning should not be hampered without sufficient cause, Congress long ago established the principle that no single federal judge had the power to enjoin a state official from action where the official was acting under a state law or an order of an administrative body. The language of 28 U.S.C.A. § 2281 so declaring is clear and unequivocal:

"An interlocutory or permanent injunction restraining the enforcement, operation or execution of any State statute by restraining the action of any officer of such State in the enforcement or execution of such statute or of an order made by an administrative board or commission acting under State statutes, *shall not be granted* by any district court or judge thereof upon the ground of the unconstitutionality of such statute unless the application therefor is heard and determined *by a district court of three judges* under section 2284 of this title." [Emphasis added.]

That statute has nevertheless, in a series of recent cases in this Circuit, been construed as investing a single district judge with the power to grant injunctions whenever the statute under which the state officer assumes to act is in his sole opinion clearly unconstitutional. That is exactly what Congress prohibited. By the plain language used, Congress intended to take away from one man the power to decide whether state statutes were unconstitutional, and to lodge that power only in three judges. No amount of casuistry can change the meaning of the statute so as to invest it with the meaning lately given it in this Circuit.[27]

The Supreme Court had declared unequivocally what Congress meant by this statute in its decision in Stratton v. St. Louis Southwestern Railway Co., 1930, 282 U.S. 10, 14–15, 51 S.Ct. 8, 10, 75 L. Ed. 135:

" * * * By the statute * * * the Congress sought to make interference by interlocutory injunction

---

27. See, e. g., Board of Supervisors, etc., v. Tureaud, 5 Cir., 1955, 225 F.2d 435, and same case, 5 Cir., 1955, 226 F.2d 714, and 5 Cir., 1956, 228 F.2d 896; and see also Brown v. Rippy, 5 Cir., 233 F.2d 796; and Lucy v. Adams, D.C.N.D.Ala. 1955, 134 F.Supp. 235, affirmed Adams v. Lucy, 5 Cir., 1956, 228 F.2d 619.

with the enforcement of state legislation *a matter for the adequate hearing and full deliberation which the presence of a court composed of three judges, as provided by the statute, was likely to secure. * * * "* [Emphasis added.]

Again, in Cumberland Telephone & Telegraph Co. v. Louisiana Public Service Commission, 1922, 260 U.S. 212, 43 S.Ct. 75, 76, 67 L.Ed. 217, the Court said: "The legislation was enacted for the manifest purpose of *taking away the power of a single United States judge, * * * to issue an interlocutory injunction against the execution of a state statute by a state officer * * ** on the ground of the federal unconstitutionality of the statute. * * * The wording of the section leaves no doubt that Congress was by provisions *ex industria* seeking to make interference by interlocutory injunction from a federal court with the enforcement of state legislation regularly enacted and in course of execution, a matter of the *adequate hearing and the full deliberation which the presence of three judges, one of whom should be a Circuit Justice or Judge,* was likely to secure. It was to prevent the improvident granting of such injunctions by a single judge, and the possible unnecessary conflict between federal and state authority always to be deprecated. * * * *This is a question of statutory power and jurisdiction, not one of judicial discretion or equitable consideration."* [28] [Emphasis added.]

The Supreme Court has never uttered a word tending to justify the present procedure of permitting state statutes to be stricken down by one judge, and the practice in effect in this Circuit is one of local origin and invention.

(3) Following this trend of brushing aside the congressional scheme for insuring deliberate action by federal courts in dealing with state officials earnestly and honestly asserting their reliance upon state statutes, a three-judge court, convened pursuant to the request of the parties, recently dissolved itself and commissioned one judge to hear a case in which such reliance was asserted.[29] This was done in spite of the fact that the state officials were staking their reliance in part upon statutes of Louisiana passed in 1954, based upon constitutional principles not theretofore presented to the Supreme Court or declared invalid or unenforceable by any other court.[30] The Per Curiam opinion rendered by the three-judge court based its action upon Ex parte Poresky, 290 U.S. 30, 54 S.Ct. 3, 78 L.Ed. 152, the same case on which the other efforts to by-pass 28 U.S.C.A. § 2281 et seq. have been bottomed.

That case does not, in my opinion, tend, in the slightest degree, to sustain such

**28.** And see the further discussion of the question and citation of additional authorities in my dissent in Board of Supervisors, etc. v. Tureaud, 225 F.2d at page 440 et seq.

**29.** Bush v. Orleans Parish School Board, D.C.1956, 138 F.Supp. 336, and cf. D.C., 138 F.Supp. 337; motion for leave to file Petition for Mandamus denied by the Supreme Court in 351 U.S. 948, 76 S.Ct. 854. This denial of mandamus expresses no opinion on the merits of the question presented. United States Alkali Export Ass'n v. United States, 1945, 325 U.S. 96, 65 S.Ct. 1120, 89 L.Ed. 1554; Agoston v. Commonwealth of Pennsylvania, 1950, 340 U.S. 844, 71 S. Ct. 9, 95 L.Ed. 619; United States v. Shubert, 1955, 348 U.S. 222, 75 S.Ct. 277, 99 L.Ed. 279; and Ex parte Roe, 1914, 234 U.S. 70, 34 S.Ct. 722, 58 L.Ed. 1217.

The Supreme Court would doubtless have denied the drastic and discretionary writ of mandamus if the three-judge court had exercised the "scrupulous regard * * * for the rightful independence of state governments" mentioned *supra,* and had given the State of Louisiana the "adequate hearing and the full deliberation which the presence of three judges * * * was likely to secure."

In this case, as well as the others which have lodged illegal power in one judge, the collision has been, not between two schools of thought as to constitutional construction, but between the rights of the states and the convenience of the judges.

**30.** See e. g. L.S.A. 17:81:1, 13 West's L.S.A. Revised Statutes.

action. Poresky had brought suit against the Governor and other officials of Massachusetts to restrain enforcement of the state's compulsory automobile liability insurance laws. The District Court dismissed the complaint, declining to assemble a three-judge court, because the Supreme Court had held in a number of cases that such statutes were not unconstitutional. The District Judge also held that § 2281 did not apply. That holding was plainly correct. Poresky was trying to *destroy* state statutes, while § 2281 is designed solely to *protect* state officers and state statutes. The District Judge put an end to Poresky's effort to strike down the state statutes, holding that such an effort, under the circumstances, was frivolous. If, instead of dismissing the complaint, the District Judge had entertained it and had enjoined the enforcement of the state statutes at Poresky's behest, the situation would have paralleled that under discussion here, and § 2281 would certainly have condemned such action.

In upholding the District Judge's ruling in Poresky's case, the Supreme Court sanctioned the right of a single judge to halt at its inception a frivolous attack on the constitutionality of a state law. The Supreme Court did not even hint that a single federal judge had the right to entertain such an attack and to strike down a state law without calling in two judges to insure that precipitate and unseemly action should not be taken in derogation of the rights of the states, which Congress was at such pains to surround by the meticulous safeguards of § 2281.

(4) Another recent instance of disregard for the rights of the states is afforded by the decision of a three-judge court nullifying certain ordinances of the City of Montgomery and statutes of the State of Alabama relating to segregation of passengers on common carriers within the state.[31] Notwithstanding the pendency of a state court suit in which the identical questions were involved between some of the same parties and which had already proceeded to judgment and had declared the same laws constitutional and granted injunction against their violation,[32] the District Court of three judges, with one judge dissenting, proceeded to declare the whole system of laws unconstitutional and to grant an injunction against their enforcement. The District Court there was evidently not much persuaded by the admonition (fn. 9, supra) of the Supreme Court to the effect that " ' "the guiding consideration" ' " in such matters would suggest " ' "much circumspection in avoiding occasions for placing the tribunals of the States and of the Union in any collision" ' "; nor did it find itself deterred by the language of Mr. Justice Holmes:[33] " 'The relation of the United States and the Courts of the United States to the States and the courts of the States is a very delicate matter that has occupied the thoughts of statesmen and judges for a hundred years * * *.' "

It is worth noting in passing that the three-judge court, in discussing the subject "Comity" in its opinion, is not supported by the authorities cited in Note 11 as justification for its action in proceeding in spite of the pendency, at an advanced stage, of the state court suit. The only one of the five cases cited which involved a situation where a state court suit was pending was Wilson v. Beebe, D. C., 99 F.Supp. 418; in that case the United States District Court suspended proceedings until the state court concluded its case.

This Court did the same thing—i. e., declined to act because of the pendency of the state court suit—in Niehaus v. Magnolia Textiles, Inc., 5 Cir., 1949, 175 F.2d 977, although the federal action was begun before the state suit. And cf. our decision in Illinois Central R. Co. v. Bul-

---

31. D.C.M.D.Ala., Browder v. Gayle, D.C. M.D.Ala., 142 F.Supp. 707.
32. Here, as is customary, stress is laid upon the peculiar province of Federal Courts to enforce constitutional rights.

Which Constitution? The one which has the Tenth Amendment as its core?
33. Quoted in Douglas v. City of Jeannette, supra [342 U.S. 117, 72 S.Ct. 122], from Stefanelli v. Minard, supra.

lock, 5 Cir., 1950, 181 F.2d 851, and the Supreme Court's holding in Railroad Commission of Texas v. Pullman Co., 1941, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971. In such a situation the oft-quoted dictum applies, "The only restraint upon our action is our own self-restraint."

Again, in Howard v. Ladner, D.C.S.D. Miss.1953, 116 F.Supp. 783, a three-judge court was asked to employ its injunctive powers to require officials of the State of Mississippi to register a political party. That relief could not be granted without declaring a statute of the State of Mississippi unconstitutional. The Supreme Court of Mississippi [34] had, in a suit between the same parties, held that the Mississippi statute in question was constitutional.[35] Nevertheless, the District Court proceeded to strike down the Mississippi statute and to issue a mandatory injunction in derogation of its terms.[36]

These cases involved not only whether the amenities of Comity should be observed, but whether the states are to be accorded the dignity and respect to which they are entitled under the Tenth Amendment and the Acts of Congress and decisions of the Supreme Court above discussed. In each instance the question involved did not relate to whether the constitutional rights of the individuals involved should be safeguarded, but merely the route which should be traveled in the process.

### IV.

Thus to cast the states in a role of subordination to the central government in areas where they are patently supreme, especially by reaching beyond any instruction yet given by the Supreme Court, is, in my opinion, to evince a loss of perspective, to ignore the teachings of history and to strike a blow at our constitutional system at its most vital point. Ours is the stern duty to hearken to the voices of the states, "as earnest [if] less shrill", in order to preserve the symmetry, the proportion and the delicate balance in which state sovereignty is basic and of crucial importance.

History combines with the cases above discussed and the Acts of Congress treated in them to admonish us to be not overpersuaded by the unctuous voices of the concatenate coteries of coddled claques, chanting their well-rehearsed clichés into permitting the reverence all courts hold for due process and equal protection, to tempt us to forget that the bedrock of our constitutional system rests upon faith in and respect for the states and their rights.

In his Goodkin Lectures at Harvard University, 1955,[37] Mr. Justice Jackson stated, "We must not forget that, at bottom, the Civil War was fought over constitutional doctrine." Then and ever since, the states and the people of this Circuit have been the inveterate champions of local self-government, of the rights of the states to govern themselves in the intimate details of their daily lives to the end that liberty may be a reality and not merely an euphuistic concept. Ours is the task, as inheritors of that conviction, guardians of that faith, to "strain hard" to find in the Constitution and the Supreme Court decisions construing it, the means by which government under the malign aegis of judicial fiat may be kept at a minimum; and by which unwarranted encroachments of the federal government may be averted and the sacred

---

34. Hoskins v. Howard, 1952, 214 Miss. 481, 59 So.2d 263.

35. That holding was final, subject to the right of appeal to the Supreme Court of the United States, which was not utilized, and the judgment was therefore *res judicata*, Angel v. Bullington, supra.

36. The Supreme Court of the United States promptly vacated the judgment of the District Court on the face of the record and without reaching the merits, and ordered the complaint dismissed. White v. Howard, 1954, 347 U.S. 910, 74 S.Ct. 476, 98 L.Ed. 1067.

37. "The Supreme Court in the American System", Harvard University Press, p. 56. It is stated in the Foreword that he worked for several hours the day of his death on the Lecture from which the quotation is taken.

rights of the states preserved. It would be a tragic paradox if the congeries of rights which constitute and cluster around the Tenth Amendment should be done to death or even crippled in the house of its friends. These basic differences with the majority make it impossible for me to join them in a reversal and constitute the reasons for my dissent.

Rehearing denied: Cameron, Circuit Judge, dissenting.